**ASTENJOHNSON, Plaintiff**

v.

**COLUMBIA CASUALTY CO., et al., Defendants.**

**Civil Action No. 03–1552.**

United States District Court, E.D. Pennsylvania.

March 30, 2007.

John N. Ellison, Michael Conley, Anderson Kill & Olick PC, Philadelphia, PA, for Plaintiff.

Jay I. Morstein, Piper & Marbury, LLP, Baltimore, MD, Nicole Rosenblum, Ronald P. Schiller, DLA Piper Rudnick Gray Cary US, LLP, Philadelphia, PA, Jeffrey Kaufman, Lisa G. Rowe, Paul A. Peters, Kaufman & Logan LLP, San Francisco, CA, Susan Simpson Brown, Nelson Levine de Luca & Horst LLC, Blue Bell, PA, for Defendants.

### *OPINION*

STENGEL, District Judge.

AstenJohnson, Inc. made a product which contained asbestos fibers and which was used in paper manufacturing. Since the late 1970s Asten has been named as a defendant in lawsuits brought by plaintiffs who allege injuries from exposure to asbestos products. In the early 1990s these claims increased dramatically. To defend these cases and, where appropriate, to pay the plaintiffs, Asten tendered the cases to its insurance carriers.

Columbia Casualty Company and American Insurance Company wrote $52 million worth of liability insurance for Asten in 1981 and 1982. Their policies contained an exclusion from coverage for any claim resulting from "an exposure to or the contracting of asbestosis." The interpretation of that phrase lies at the center of this case. If Asten's interpretation is correct, it will enjoy coverage for all asbestos claims, except for asbestosis claims. If Columbia and American's interpretation is correct, all asbestos-related claims would be excluded and Asten will not have the

benefit of any coverage from these carriers for pending and future asbestos claims.

The problem with the exclusion is that it does not make sense. A person cannot be "exposed to asbestosis" because it is not a contagious disease. A person can, however, be exposed to asbestos, and can develop asbestosis or other illnesses (mesothelioma, to name one) from this exposure. The language of the exclusion is clear, *i.e.*, unambiguous, in that asbestosis is a medically recognized disease. Yet, the parties cannot agree on the meaning of the term "asbestosis" in the context of their insurance contracts.

In the interpretation of contract terms, the intent of the parties must be ascertained from the language of the policy. After considering the language of the exclusion in light of the various manifestations of the intent of the parties, the trade usage of the term "asbestosis," the parties' usage of the term "asbestosis," and the course of performance of Asten under the policies, I conclude that the parties intended to exclude from coverage all claims arising from exposure to asbestos.

## *TABLE OF CONTENTS*

I. INTRODUCTION ................................................... 432

II. FINDINGS OF FACT ............................................... 433
 A. Parties ...................................................... 433
 1. AstenJohnson, Inc. ...................................... 433
 2. Columbia Casualty Company ............................. 433
 3. American Insurance Company ............................ 434
 B. Nature of Claims ........................................... 434
 C. Asten's Insurance Policies at Issue ......................... 434
 1. The Columbia Policies ................................... 434
 a. April 1, 1981 to April 1, 1982 Policy Period ......... 434
 b. April 1, 1982 to October 1, 1983 Policy Period ...... 434
 c. Terms of the Columbia Policies ..................... 435
 2. The American Policies ................................... 435
 a. Pre–April 1981 Policy Periods ...................... 435
 b. April 1, 1981 to April 1, 1982 Policy Period ........ 436
 c. April 1, 1982 to October 1, 1983 Policy Period ...... 437
 d. Asten's Canadian Affiliate's Policies ............... 437
 D. Asten's Asbestos–Related Claims and Early Coverage ....... 438
 1. Initial Asbestos–Related Lawsuits Against Asten ........ 438
 a. *Utter v. Asten–Hill:* Pennsylvania Supreme Court case ............. 439
 2. Asten's 1980 Coverage Action ........................... 439
 3. Argonaut Insurance Coverage (1980–1981) .............. 440
 4. Asten's Canadian Affiliate's Insurance .................. 441
 5. AJN's Internal Understanding of its Asbestos–Related Claims .......... 441
 E. Asten's Purchase of the Subject Policies .................... 442
 1. Generally ................................................ 442
 2. The Insurance Intermediaries and Insurance Binders ..... 442
 a. Babb, Inc. ........................................ 442
 b. Delaware Valley Underwriting Agency .............. 442
 c. Insurance Binders ................................. 443
 3. Negotiation and Placement of the Policies at Issue ...... 444
 a. Correspondence and Communications Among the Parties Leading Up to the Placement of the 1981 Columbia Policies ..... 444
 b. Underwriting of the 1981 American Umbrella Policy .............. 445
 c. The 1982 Subject Policies .......................... 446
 F. Course of Performance ...................................... 447
 1. Asten's Insurance Recovery Efforts ...................... 447
 a. Quantity of Asbestos Claims Against Asten ......... 447

 b. 1980 Coverage Action ............................................447
 c. Notice of Asbestos Claims to Insurers ...........................448
 i.) 1980s & 1990s ............................................448
 ii.) Asten's Policy Registers ...............................449
 iii.) Recent Efforts Involving Defendants .....................449
 iv.) Result of Late Notice to Defendants .....................450
 d. Swiss Re Policy ...........................................451
 2. Asten's Internal Documents—History of Recording and Reporting
 Asbestos Litigation, Insurance Claims, and Available Insurance
 Coverage ....................................................452
 3. Proposed Policy Renewal in 1983 ................................452
 G. Trade Custom and Usage of the Word "Asbestosis" .......................453
 H. The Stub Issue—the Aggregate Limits of the April 1982 to October 1983
 Policies ...............................................................455
 1. 1982 Columbia Policies .........................................455
 2. 1982 American Policies .........................................455
 a. 1982 American Umbrella Policy ...............................455
 b. 1982 American Excess Policy .................................456
 I. Duty to Defend under the Excess Policies .............................456
 1. Columbia Excess Policies .......................................456
 2. American Excess Policy .........................................457

**III. CONCLUSIONS OF LAW WITH DISCUSSION** .............................458
 A. Jurisdiction, Venue, and Governing Law .............................458
 B. Laches ...............................................................458
 1. Equitable Doctrine of Laches—In General ........................458
 2. Columbia's Laches Defense ......................................459
 3. American's Laches Defense ......................................460
 C. Agency Relationships in the Placing of Asten's Insurance .................461
 D. Interpretation of the Asbestosis Exclusion...............................462
 1. General Principles of Insurance Contract Interpretation .................462
 2. Is the Asbestosis Exclusion Unambiguous? ..........................463
 a. Determining the Intent of the Parties from the Language of the
 Exclusion.............................................................463
 b. Trade Custom and Parties' Usage of the Term "Asbestosis" .........465
 c. Course of Performance .......................................467
 d. The Circumstances Surrounding the Entering into the Subject
 Policies ...............................................................470
 e. Conclusion...................................................473
 E. Defendants' Affirmative Defenses .....................................474
 1. Late Notice and Prejudice ......................................474
 2. Breach of the Duty of Good Faith and Fair Dealing .....................474
 F. Asten's Breach of Contract Claim .....................................475
 G. Defendants' Counterclaims ...........................................475
 1. Rescission .....................................................475
 2. Reformation ...................................................476
 H. Aggregate Limits of Liability for the 1982 18–Month Policies .................477
 1. 1982 Columbia Policies .........................................478
 a. 1982 Columbia Primary Policy ...............................478
 b. 1982 Columbia Excess Policy.................................478
 2. 1982 American Policies .........................................478
 I. Duty to Defend and Pay Defense Costs Under Defendants' Excess
 Policies ...............................................................479
 1. Columbia Excess Policies .......................................479
 2. 1982 American Excess Policy ....................................479

**IV. CONCLUSION** ................................................................480

## I. INTRODUCTION

This is a declaratory judgment and breach of contract action brought by AstenJohnson, Inc. against Columbia Casualty Company and American Insurance Company. At issue is the availability and the scope of coverage for asbestos-related bodily injury claims under two primary and two excess policies issued by Columbia and two umbrella and one excess insurance policies issued by American.[1] AstenJohnson manufacturers dryer felts and other materials used in the paper industry and began to receive asbestos-related claims in or about 1978. Asten tendered the defense of the asbestos lawsuits and requested coverage from Columbia in 2001. Both Columbia and American denied coverage for all underlying asbestos-related bodily injury claims due to an "Asbestosis Exclusion" found in the Subject Columbia Policies. The relevant portion of the exclusion states: "It is agreed that this policy does not apply to any claim alleging an exposure to or the contracting of asbestosis or any liability resulting therefrom."

Asten seeks the following declarations concerning coverage under the Columbia policies:

(1) The Asbestosis Exclusion does not bar coverage for all asbestos-related bodily injury claims, but merely excludes claims in which the diagnosis alleged is asbestosis.

(2) The primary and excess Columbia policies issued in 1982 contain an annualized aggregate such that their respective limits of liability are counted twice—once for the annual period between April 1, 1982 through April 1,1983 and again for the six month "stub" period from April 1, 1983 through October 1,

1983—for a total of $2 million and $20 million in coverage respectively.

(3) The two Columbia excess policies include a duty to defend and/or obligation to indemnify for defense costs.

In response, Columbia takes the position that (1) the Asbestosis Exclusion should be interpreted as barring all asbestos-related claims; (2) neither of its 1982 policies contain or can otherwise be interpreted as extending two aggregate limits per policy; and (3) its two excess policies do not incorporate a duty to defend and/or obligation to indemnify for defense costs. Columbia also asserts counterclaims against Asten seeking rescission of the Subject Columbia Policies based on misrepresentations made in the application process, as well as reformation of the Asbestosis Exclusion. Finally, Columbia raises the following affirmative defenses to coverage: late notice and prejudice; laches; known loss doctrine/non-fortuitous loss doctrine; and breach of the duty of good faith and fair dealing.

Asten seeks the following declarations concerning coverage under the American policies:

(1) The Asbestosis Exclusion, to which the American coverage conforms, does not bar coverage for all asbestos-related bodily injury claims, but merely excludes claims in which the injury alleged is asbestosis.

(2) The umbrella and excess American policies issued in 1982 contain an annualized aggregate such that their respective limits of liability are counted twice—once for the annual period between April 1, 1982 through April 1, 1983 and again for the six month "stub" period from

1. The policies will be referred to as the Subject Columbia Policies and Subject American Policies, and collectively as the Subject Policies.

April 1, 1983 through October 1, 1983—for a total of $20 million in coverage.

(3) The American excess "XLX" policy includes a duty to defend and/or obligation to indemnify for defense costs.

In response, American contends that (1) its policies conform to the underlying Columbia primary policies and exclude all coverage for any asbestos-related claim; (2) a single aggregate limit of $10 million is available for each of its policies issued to Asten from April 1, 1982 through October 1, 1983; (3) all the underlying asbestos claims arose from one occurrence, namely the manufacture of asbestos by Asten, and the maximum amount of coverage available under each 1982 policy is the per occurrence limit; and (4) it has no duty to pay defense expenses under its XLX policy. In the alternative, American claims that (1) its policies should be reformed to reflect the mutual intent of the parties to exclude all asbestos-related claims, or (2) its policies should be rescinded based on Asten's misrepresentations to American at the time of issuance of the Subject American Policies. Finally, American alleges that Asten violated the notice and cooperation provisions of American's policies and committed laches to American's material prejudice. Under these affirmative defenses, American argues that it is relieved of any obligation to defend or indemnify Asten against any asbestos-related claim.

This court held a bench trial on this declaratory action from July 10, 2006 to July 13, 2006 and during seven days in September of 2006. After consideration of the trial testimony, the admitted exhibits, the deposition designations, the parties' proposed findings of fact and conclusions of law, and the parties' oral argument, this court finds as follows:

## II. FINDINGS OF FACT

### A. PARTIES

#### 1. AstenJohnson, Inc.

1. AstenJohnson, Inc.,[2] the successor-in-interest to The Asten Group and Asten-Hill Company, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 4399 Corporate Road, Charleston, South Carolina.

2. From at least 1957 until 1983, Asten was headquartered in Devon and Philadelphia, Pennsylvania and engaged in the manufacture and distribution of products for the paper industry, including for a period of time, chrysotile asbestos-containing dryer fabrics for use in paper machines. Asten continues to maintain a plant in Warrendale, Pennsylvania.

3. AJN is the successor-in-interest to all of the entities listed as named insureds in the insurance policies in this lawsuit.

#### 2. Columbia Casualty Company

4. Defendant Columbia Casualty Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located at CNA Plaza, Chicago, Illinois.

5. At all times relevant hereto, Columbia is and was licensed to transact business in the Commonwealth of Pennsylvania as a surplus lines insurance company, and Columbia does and did transact business in the Commonwealth of Pennsylvania.

6. Columbia is part of the CNA group of insurance companies.

---

**2.** AstenJohnson, Inc. was formed in 1999 from the merger of The Asten Group and Johnson Company. I will refer to the company and its predecessors-in-interest collectively as "Asten," "AstenJohnson," and "AJN," unless there is need for clarification. Asten–Hill Inc. was a Canadian affiliate.

### 3. American Insurance Company

7. Defendant American Insurance Company is an insurance company organized and existing under the laws of the State of Nebraska with its principal place of business at 777 San Marin Drive, Novato, California 94998.

8. At all times relevant hereto, American is and was licensed to transact business in the Commonwealth of Pennsylvania, and American does and did transact business in the Commonwealth of Pennsylvania.

9. American is part of the Fireman's Fund group of insurance companies.[3]

### B. NATURE OF CLAIMS

10. Asten, the insured, seeks a declaratory judgment against Columbia and American, its insurers, for a determination of its rights under policies issued by the Insurance Companies. The Insurance Companies refuse to defend or indemnify Asten in asbestos-related lawsuits filed against Asten. The Insurance Companies have denied coverage due to the existence of the "Asbestosis Exclusion" in the Subject Policies.

11. The Insurance Companies raise several affirmative defenses to Asten's action, including late notice, laches, and breach of the duty of good faith and fair dealing.

12. The Insurance Companies filed several counterclaims against Asten, including reformation and rescission of the insurance contracts at issue.

### C. ASTEN'S INSURANCE POLICIES AT ISSUE[4]

### 1. The Columbia Policies[5]

##### a. April 1, 1981 to April 1, 1982 Policy Period

13. Columbia sold Asten a one-year primary-layer comprehensive general liability insurance policy, Policy No. CCP 186 60 01, covering the period between April 1, 1981 and April 1, 1982, providing occurrence/aggregate limits of $1,000,000 and having a $2,500 per claim deductible ("**1981 Columbia Primary Policy**"). The policy provides for a duty to defend, which is to be paid in addition to the indemnity limits. *See* CCC277.

14. Columbia also sold to Asten an Excess Third Party Liability Policy, Policy No. RDX 417 02 07 for April 1, 1981 to April 1, 1982, providing occurrence/aggregate limits of $10,000,000 ("**1981 Columbia Excess Policy**"). The policy is in excess to the limits set forth in the underlying American umbrella policy, policy No. XLB 146 78 46, detailed below. *See* CCC188; P7.

##### b. April 1, 1982 to October 1, 1983 Policy Period

15. Columbia sold Asten a comprehensive general liability policy, Policy No. CCP 186 61 10, for the eighteen-month period between April 1, 1982 and October 1, 1983, providing occurrence/aggregate limits of $1,000,000, and having a $2,500 per claim deductible ("**1982 Columbia Primary Policy**"). The policy provides for a duty to defend, which is to be paid in

---

3. Columbia and American are collectively referred to herein as the "Insurance Companies."

4. The following designations are used for the trial exhibits: Columbia's exhibits begin with "CCC," American's exhibits begin with

"AMER," and Asten's exhibits being with "P." In addition, all references to the trial transcript begin with "Tr."

5. The 1981 and 1982 Columbia primary and excess policies are collectively referred to herein as the "Subject Columbia Policies."

addition to the indemnity limits. *See* CCC229.

16. Columbia sold to Asten an Excess Third Party Liability Policy, Policy No. RDX 917 61 20, for April 1, 1982 to October 1, 1983, providing per occurrence/aggregate limits of $10,000,000 ("1982 **Columbia Excess Policy**"). The policy is in excess to the limits set forth in underlying American umbrella policy, policy No. XLB 152 13 08, detailed below. *See* P9.

### c. Terms of the Columbia Policies

17. The Subject Columbia Policies contain an "Asbestosis Exclusion," which reads:

*Asbestosis Exclusion*

It is agreed that this policy does not apply to any claim alleging an exposure to or the contracting of asbestosis or any liability resulting therefrom.

It is further agreed that this policy does not apply to any claim arising out of the Insured's membership in the Asbestos Textile Institute.

*See* CCC277; CCC188 (does not contain the word "Textile" in second sentence); CCC229; P9.

18. The word "asbestosis" was not defined in any of the policies.

19. Columbia has denied coverage to Asten for all underlying asbestos-related bodily injury claims due to the Asbestosis Exclusion.

20. The Notice Provision of the Columbia primary policies states:

*Insured's Duties in the Event of Occurrence, Claim or Suit*

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conducts of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under the policy, and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

*See* CCC277; CCC229.

21. The Columbia excess policies contain a notice provision that states:

*Notice of Loss: Participation in Defense by the Company*

Notice of an occurrence which appears likely to involve this policy shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. The company at its own option may, but is not required to, participate in the investigation, settlement or defense of any claim or suit against the insured.

*See* CCC188; P9.

### 2. The American Policies[6]

### a. Pre–April 1981 Policy Periods

---

**6.** Ms. Charlotte Zack testified on September 26, 2006, as to the distinction between an

22. American first began insuring AJN in 1979 when it sold a Blanket Excess Liability Policy XLB 133 07 30 to Asten. The 1979 Policy provides $10,000,000 in coverage, excess to a $1,000,000 primary policy sold by Commerce & Industry Insurance Company. *See* P1.

23. In 1980, American sold AJN a Blanket Excess Liability Policy XLB 142 69 78, with $10,000,000 in annual indemnity limits, excess to a $1,000,000 primary policy issued by Argonaut Insurance Company. *See* P2.

24. Neither the 1979 or 1980 American policies contain any asbestos-related exclusions. *See* P1; P2.

25.The 1980 American Policy contains a Following Form Products Liability Endorsement which states:

It is agreed that this policy does not apply under coverage A and B except insofar as coverage is available to the insured under primary policies, to occurrences arising out of the products, hazards or the completed operations hazards as defined in this policy.

*See* AMER615.

 *b.* *April 1, 1981 to April 1, 1982 Policy Period*

26. For the annual policy period beginning April 1, 1981, American sold to Asten Blanket Excess Liability Policy XLB 146 84 46 with $10,000,000 annual indemnity limits ("**1981 American Umbrella Policy**"), excess to the $1,000,000 1981 Columbia Primary Policy. *See* P3; AMER30.

27. The 1981 American Umbrella Policy contains no asbestos-related language. *See* P3.

28. The 1981 American Umbrella Policy contains the same Following Form Products Liability Endorsement contained in the 1980 American Umbrella Policy. *Compare* P3 *with* AMER615.

29. The 1981 American Umbrella Policy provides a defense obligation, requiring American to defend and pay for a defense in addition to the indemnity limits. *See* P3; AMER30

30. The 1981 American Umbrella Policy contains a notice provision that states:

*Notice of Occurrence, Claim or Suit:— Insured's Duty*

When an occurrence takes place which is reasonably likely to give rise to a claim under this policy, written notice shall, subject to the insured's obligation with respect thereto under any primary insurance, be given as soon as practicable by or on behalf of the Insured to the Company or any of its authorized agents. Such notice shall contain particulars sufficient to identify the insured and reasonably obtainable information concerning the time, place and circumstances of the occurrence and pertinent details. The insured shall give like notice of any claim or suit on account of such occurrence and shall immediately forward to the Company every demand, notice, summons or other process received by him or his

umbrella policy and an excess policy in the early 1980s: [A]n umbrella policy provides two things. One, it provides excess limits above coverage provided by underlying policies.... Umbrella policies also have the potential to provide some first dollar drop down coverage over in these days—in those days self-insured retention or SIR for short for coverages that were not provided by the primary policy, but were provided by the umbrella policy. A high excess policy on the

other hand is a pure mirror, if you will, of the policies underneath it. It's never broader than the terms of the most restrictive underlying policy.... However, it can be narrower .... Tr. 9/26/06 Zack at 164–165. *See also* Eugene R. Anderson, et al., Insurance Coverage Litigation §§ 13.01, 13.02 (2nd ed.2000 & 2006 supp.) (discussing the difference between primary, umbrella, and excess insurance policies).

representative, together with copies of reports of Investigations made by the Insured with respect to such claim or suit. *See* P3; AMER30.

c. *April 1, 1982 to October 1, 1983 Policy Period*

31. For the eighteen-month policy period beginning April 1, 1982, American sold to Asten Blanket Excess Liability Policy XLB 152 13 08 with indemnity limits of $10,000,000 ("**1982 American Umbrella Policy**"), excess to the $1,000,000 1982 Columbia Primary Policy. *See* P4; AMER60 and AMER90.

32. The 1982 American Umbrella Policy contains no asbestos-related language. *See* P4.

33. The 1982 American Umbrella Policy contains substantially the same Following Form Products Liability Endorsement and notice provision contained in the 1981 American Umbrella Policy.

34. The 1982 American Umbrella Policy provides a defense obligation, requiring American to defend and pay for a defense in addition to the indemnity limits. *See* P4.

35. The 1982 American Umbrella Policy contains an Annual Aggregate Endorsement that states:

*Insured's Retained Limit—Annual Aggregate*

Notwithstanding anything to the contrary in Insuring Agreement II limit of liability, it is agreed that where there is no primary insurance or other insurance available to the insured and the Insured's Retained Limit applies:

As respects each separate annual period of the policy, the Insured's Retained Limit stated in the declarations shall be reduced by the amount of damages paid by the insured or for which the insured is legally liable under each claim or suit against the insured in said annual period

until the Insured's Retained Limit is exhausted. Thereafter this policy shall apply without application of the Insured's Retained Limit to any additional claim or suit against the insured until the inception of the next succeeding annual period at which time the Insured's Retained Limit shall be reinstated in full subject again to reduction in said succeeding annual period as above provided.

The annual periods of this policy are each year beginning with the inception date as shown in # 2 of the declarations. P4; AMER60.

36. American sold to Asten Blanket Excess Liability Policy XLX 148 11 2 1, for the policy period April 1, 1982 to October 1, 1983 ("**1982 American Excess Policy**"). *See* AMER53. The 1982 American Excess Policy has liability limits of $10,000,000, excess of the underlying limits consisting of the 1982 American Umbrella Policy and the 1982 Columbia Excess Policy. *See* AMER53.

37. The 1982 American Excess Policy also contains substantially the same Following Form Products Liability Endorsement and notice provision contained in the 1981 American Umbrella Policy. *See* AMER53.

38. The relevant notice portion of the 1982 American Excess Policy states: "**Notice of Occurrence.** The Insured shall immediately advise the company of any occurrence or disaster which will probably result in liability under this Policy." *See* AMER53.

d. *Asten's Canadian Affiliate's Policies*

39. Fireman's Fund sold to Asten Hill, Inc., a Canadian affiliate of the plaintiff that purchased insurance separately from AJN, Policy Number XLB 1425518, for the

period June 15, 1981 to April 1, 1982. *See* P96. The policy contains an exclusion that stated: "It is understood and agreed that coverage given by this policy does not apply to claims arising out of bodily injury as a result of exposure to, inhalation of, absorption of, or consumption of the insured's asbestos product(s)." *Id.*

40. Fireman's Fund also sold to Asten Hill, Inc., Policy Number CA 00626 for the period April 1, 1982 to April 1, 1983. *See* P97. The policy contains an exclusion that stated: "It is a condition of this policy that it excludes liability arising out of products containing asbestos." *Id.*

41. Fireman's Fund also sold to Asten Hill, Inc., Policy Number XLB 142 53 63 for the period April 1, 1982 to April 1, 1983. *See* P98. The policy contains the following exclusion: "It is understood and agreed that coverage given by this policy does not apply to claims arising out of bodily injury as a result of exposure to, inhalation of, absorption of, or consumption of the insured's asbestos products." *Id.*

### D. ASTEN'S ASBESTOS-RELATED CLAIMS AND EARLY COVERAGE

#### 1. *Initial Asbestos-Related Lawsuits Against Asten*

42. Asten began receiving third party asbestos-related claims in or about 1978. *See* Tr. 7/11/06 Young at 75:19–22, 76:5–6.

43. James A. Young, Esquire, first became involved as outside counsel for AJN's asbestos-related issues in late 1978 or early 1979 when AJN first began to be named in asbestos-related suits. Since then Mr. Young has functioned as AJN's national coordinating counsel for defending asbestos claims. *See* Tr. 7/11/06 Young at 75:22–76:14.

44. The early asbestos-related claims against AJN were generally brought by workers at the Philadelphia Navy Yard. AJN never sold any products to the Philadelphia Navy Yard nor any of the other work locations where the early claimants allege that they had inhaled asbestos fibers. Most of these early asbestos-related claims that named AJN as defendant arose out of AJN's membership in the Asbestos Textile Institute ("ATI"). *See* P12; Tr. 7/11/06 Young at 80:8–80:20, 81:18–81:23, 82:3–82:12.

45. Mr. Young explained that most of the ATI suits against AJN, prior to the mid–1980s, ended in dismissals without any settlement payment by AJN. *See* AMER348; Tr. 7/11/06 Young at 108:14–109:13.

46. At the same time, some of the early asbestos-related claims contained products liability allegations, alleging diseases resulting from exposure to asbestos in Asten's products. *See, e.g.,* AMER660. Young credibly testified that these claims were erroneous because the uncontradicted evidence showed that Asten's asbestos-containing products were not used at the injury location. *See* Tr. 7/12/06 Young at 180–182.[7]

47. But in a pleading filed April 1981 in the Philadelphia County Court of Common Pleas, Mr. Young, on behalf of Asten, classified the claims against Asten as follows:

> The allegations of the Complaints pending against Asten Group, Inc. in the underlying one hundred fifty-three (153) cases, are that the plaintiffs have been exposed to an asbestos-containing product manufactured by Asten Group, Inc., and as a result of such exposure, the plaintiffs have contracted an asbestos-related disease. Secondly, the Com-

---

**7.** It appears that an insurance company's duty to defend would still be triggered by the filing of a complaint with erroneous factual allegations. This will be further discussed below. *See infra* Part II.G.; III.D.2.b.

plaints allege that Asten Group, Inc., as a member of the Asbestos Textile Institute, acted in a negligent or conspiratorial fashion in order to prevent the working public from learning of the hazards of exposure to asbestos-related products CCC 142.

48. It was not until the mid–1980s that Asten was named in cases brought by paper mill employees. Paper mill employees were the only workers who could have been exposed to an Asten asbestos-containing product. *See* Tr. 7/12/06 Young at 3:21–4:5. These plaintiffs' complaints typically aver that "an individual suffered bodily injury allegedly caused by inhalation of asbestos dust emitted from a product manufactured, sold or delivered by [Asten] and that [Asten] is liable for damages under a products liability theory of recovery." CCC300.

49. Many of the asbestos-related claims against Asten, from the earliest ones to the current ones, allege or potentially allege a multitude of different injuries. Asbestos-related lawsuits rarely limited themselves strictly to "asbestosis" when alleging injuries. *See* Tr. 7/11/06 Young 83:14–84:7; Tr. 9/21/06 Connolly 113:20–114:14; AMER660; AMER660(a); AMER96; AMER110; AMER441.

a. *Utter v. Asten–Hill: Pennsylvania Supreme Court case*

50. AJN was involved in a 1973 workmen's compensation case in which the Pennsylvania Supreme Court ruled that death benefits were not due an AJN employee who died of lung cancer caused by an exposure to asbestos. The court ruled that the workmen's compensation statute at that time only provided for benefits for deaths resulting from the disease asbestosis. *See Utter v. Asten–Hill Mfg. Co.*, 453 Pa. 401, 309 A.2d 583 (1973).[8]

51. In the same Pennsylvania Supreme Court opinion, the court affirmed the lower court's award of death benefits to the widows of the AJN employees. The Pennsylvania Supreme Court held that "occupational disease" as defined in the relevant portion of the workmen's compensation statute, at that time, incorporated the lung cancer of the AJN employees that was causally related to an asbestos exposure at work. "[C]ancer can be an occupational disease, though it exists in the general public, if it may be shown by competent evidence that a claimant's cancer is peculiar to the claimant's occupation by its causes and the characteristics of its manifestations." *Utter*, 309 A.2d at 588.

52. The Pennsylvania Supreme Court also discussed a correlation between asbestosis and cancer and quoted an Attorney's Manual on Medicine: "On balance, the literature would appear to indicate that the suspicion of a correlation between asbestosis and lung cancer cannot be dismissed, but that sufficient evidence is lacking to make such a correlation definitive." *Utter*, 309 A.2d at 586.

2. *Asten's 1980 Coverage Action*

53. With the exception of Allstate initially, by 1980, none of the insurance companies to which Asten had tendered asbestos claims would agree to provide Asten with coverage. *See* CCC4.

54. Accordingly, in 1980, Asten brought a coverage action against its primary general liability carriers that had purportedly

---

8. The Pennsylvania Supreme Court noted in a footnote in this portion of its opinion that the state legislature subsequently amended the statute to include the following diseases: "Asbestosis and cancer resulting from direct contact with, handling of, or exposure to the dust of asbestos in any occupation involving such contact, handling or exposure." *Utter*, 309 A.2d at 586 n. 4.

issued coverage to Asten from 1934 through April 1980 (including Zurich, PMA, Allstate, Commerce & Industry) ("1980 Coverage Action"). *See* P130; CCC8; CCC141; Tr. 7/11/06 Young at 98:18–103:3, 7/12/06 at 114:10–120:4.

55. In determining which carriers to name as defendants in this action, Mr. Young testified, "We used every name we had," even when policy documents could not be located for some carriers, like Zurich and PMA. *See* Tr. 7/13/06 Young at 149:19–151:6.

56. Later in 1980, Asten amended its complaint to add Argonaut Insurance Companies as a defendant, once it began tendering claims to Argonaut on the policy that it had just procured for the 1980–1981 time period. *See* CCC141; Tr. 7/12/06 Young at 114:10–120:4; *infra* Part II.D.3.

57. After Asten obtained coverage under the Columbia policies for the 1981–1982 time period and before Columbia renewed those same policies for the period between 1982 and 1983, Asten neither notified Columbia of the asbestos-related lawsuits nor amended its 1980 Coverage Action to add Columbia.

58. The 1980 Coverage Action was eventually stayed until the Pennsylvania Supreme Court ruled in *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa.

29, 626 A.2d 502 (1993), regarding the trigger of coverage for underlying asbestos-related claims.[9] The 1980 Coverage Action was ultimately settled in 1997. *See* P130; Tr. 7/11/06 Young at 98:18–103:3.

59. Columbia was never added as a defendant to the 1980 Coverage Action between 1980 and 1997.

### 3. Argonaut Insurance Coverage (1980–1981)

60. Argonaut Insurance Companies provided Asten with primary coverage from March 1980 through March 1981. *See* CCC57; Tr. 7/12/06 Young at 119:10–119:16.

61. The Asten employee responsible for obtaining insurance, John Flynn, wrote a "memorandum to file," with a copy to Asten's Gerald Chapman, noting that Argonaut had reported through Babb, Inc. that it was considering terminating coverage for Asten because of the asbestos claims and the potential costs of defending them. *See* AMER265.

62. In 1981, at least in part because of the influx of ATI and asbestos-related lawsuits being brought against Asten, Argonaut did not renew Asten's comprehensive general liability policy. *See* CCC1; CCC2; CCC4.

9. In *J.H. France*, the Pennsylvania Supreme Court upheld the Superior Court's application of the "multiple-trigger" theory for determining the liability of an insurer for an asbestos-related claim against the insured. The *J.H. France* court defined the term multiple-trigger in the asbestos context as follows:

> [L]iability results if any one of the following occurred during the time an insurer was on the risk: exposure to asbestos or silica, progression of the pathology, or manifestation of the disease.... The medical evidence in this case unequivocally establishes that injuries occur ... immediately upon exposure, and that the injuries continue to occur even after exposure ends during the progression of the disease right up until the

time that increasing incapacitation results in manifestation as a recognizable disease. If any of these phases of the pathogenesis occurs during the policy period, the insurer is obligated to indemnify [the insured] under the terms of the policy.... Rather than selecting one or another of the phases as the exclusive trigger of liability, it seems more accurate to regard all stages of the disease process as bodily injury sufficient to trigger the insurers' obligation to indemnify, as all phases independently meet the policy definition of bodily injury. This multiple-trigger approach, as well, has been adopted by other courts.
> *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502, 506–07 (1993).

63. Argonaut issued notices of cancellation on or about February 17, 1981 for the March 1980 primary coverage. This was just weeks before Asten applied for the 1981 insurance at issue. *See* CCC1.

64. Accordingly, Asten began looking elsewhere for replacement coverage in March 1981. *See, e.g.,* CCC4.

### 4. *Asten's Canadian Affiliate's Insurance*

65. Mr. Flynn also worked with Asten's Canadian affiliate, Asten–Hill Inc., which was also experiencing difficulty obtaining insurance coverage for asbestos claims. Although Asten and Asten–Hill were separate companies, they communicated with each other about common concerns, including insurance.

66. In March of 1981, approximately two weeks before Asten applied for the coverage at issue, Mr. Robert A. Wilson, Asten–Hill's Vice President and General Manager, conferred with Mr. Flynn regarding the refusal of all Canadian insurers to sell Asten–Hill coverage in light of its asbestos risks. *See* CCC3.

67. Asten–Hill's insurer, Commercial Union, told Asten–Hill that it was not interested in renewing coverage because of Asten–Hill's previous use of asbestos. *See* CCC3.

68. On March 20, 1981, Robert A. Wilson forwarded a memorandum ("Wilson Memo") to certain Asten officers and directors, including William Finn, John Flynn, and Jerry Chapman, explaining that Asten–Hill's broker had "tried to find another carrier to take over the coverage, but no one is interested in quoting at any price." *See* CCC3.

69. Mr. Flynn's advice to his Canadian counterpart was to seek coverage with a substantial deductible, or simply agree to self insure for asbestos claims. *See id.*

70. In response to Mr. Flynn's deductible suggestion, Asten–Hill's broker (after seeking coverage with deductibles of $500,000 or $750,000) explained that "they had already explored this possibility with no success. The reason is that if the carrier accepts any part of the liability related to asbestos products, he must then accept any writs that are served upon him. And he must then prepare the company's defense, even if there is no reasonable expectation that he will ever be called upon to pay a claim. If, on the other hand, all claims related to asbestos are excluded from the general liability insurance coverage, the carrier can refuse to accept any writs served upon him for claims which pertain to the current policy year" *See* CCC3.

71. In the hopes of securing general liability insurance coverage, Mr. Wilson executed a letter agreeing to self insure "all claims, legal expenses and the like pertaining to asbestos products linked claims." *See id.*

### 5. *AJN's Internal Understanding of its Asbestos–Related Claims*

72. On October 17, 1979, Lawrence Krupnick of Asten wrote a Memo to Asten's then CEO, Deitrich V. Asten, that the company was "vitally concerned about" "which insurance company will carry the defense of our asbestos cases." *See* AMER187.

73. Asten attempted to secure as much insurance coverage for its asbestos claims as it could in 1980. Asten notified all of its primary and excess carriers of the claims. It pursued coverage from virtually every insurance source before 1981. *See* AMER243; AMER345; CCC 105; CCC 141; CCC 151 ("It has been our policy to apprise Asten–Hill's general liability and excess liability carriers of all pending claims ...."); CCC159; CCC160;

CCC163. *See also* Tr. 7/12/06 Young at 139:9–13; 7/13/06 at 149:19–151:6.

74. Around 1980, Asten principals were concerned that asbestos claims could result in substantial costs for the company—certainly for defense and possibly for liability. Asten was aware that asbestos claims could cost substantial amounts of money to defend and settle or otherwise satisfy. This awareness informed Asten's understanding of its insurability going into its March and April 1981 insurance acquisition efforts.

75. Before Asten's brokers applied for the insurance at issue, John Flynn and others at Asten were acutely aware that: (a) Asten was being sued in hundreds of cases alleging liability arising out of the plaintiffs' exposure to asbestos, including, at least potentially, from Asten's own products; (b) such asbestos-related suits could be expensive to defend and settle or pay; and (c) insurers in the U.S. and Canada were refusing to provide any coverage for asbestos-related claims.

### E. Asten's Purchase of the Subject Policies

#### 1. Generally

76. AJN has never had an insurance department or a risk manager. *See* Tr. 7/10/06 Finn at 118:19–119:1.

77. AJN's historical insurance coverage is graphically depicted in a time line coverage chart admitted as P203. The court finds this chart to be an accurate reflection and credible statement of the history of Asten's insurance carrier, dates of coverage, and limits of coverage.

#### 2. The Insurance Intermediaries and Insurance Binders

##### a. Babb, Inc.

78. Between 1981 and 1983, Babb, Inc. ("Babb") was a retail insurance agency or retail broker. It had offices located in Wayne, Pennsylvania.

79. As an insurance broker, Babb would try to secure the best available insurance coverage for the best available price for its policyholder clients, the insured. *See* Tr. 9/22/06 Forbes at 11:22–13:1.

80. Babb, as an "independent" agency, was able to seek coverage from different insurers on behalf of its clients, and was beholden to no single insurer. *See* Tr. 9/22/06 Forbes at 19:8–16.

81. Babb was Asten's retail broker during the relevant times and worked directly with Asten to try to obtain insurance coverage in the early 1980s. *See* Tr. 9/22/06 Forbes at 15:9–16:5. Asten did not deal directly with any insurance carriers to try to get insurance. *See* Dep. Gibson at 97:10–98:4.

82. John Flynn was working with Babb to obtain the coverage at issue in this action. Gloria Forbes (whose maiden name was Gloria DeGregorio) was an account manager at Babb and she was Asten's account manager in 1981 through 1985. Ms. Forbes considered Asten her "client" and negotiated on Asten's behalf with prospective insurers. *See* Tr. 9/22/06 Forbes at 15:6–16:5.

##### b. Delaware Valley Underwriting Agency

83. Babb worked with "wholesale broker" Delaware Valley Underwriting Agency, Inc. ("DVUA") on the Columbia coverage at issue in this case. *See* Tr. 9/22/06 Forbes at 14:6–15:3, 24:23–25:5.

84. Wholesale brokers are generally used for clients who have particularly risky products, or for special programs, which need to access "Excess & Surplus Lines" ("E & SL") carriers. E & SL insurers often underwrite accounts with

unique or high risks which admitted insurers do not consider for coverage.[10] *Id.*

85. Between 1981 and 1983, DVUA represented E & SL insurance companies. *See* Tr. 9/22/06 Forbes at 25:2–25:5.

86. Columbia was an E & SL underwriter in the Commonwealth of Pennsylvania and DVUA represented Columbia. *See* Dep. Zelman at 49:8–17.

87. Because Argonaut canceled its policy with Asten and Asten increasingly was being sued in asbestos cases, Babb found it necessary to access the E & SL market, through DVUA, to request coverage from Columbia. *See* CCC4.

88. DVUA would not have direct contact with policyholders, such as AJN. *See* Tr. 9/22/05 Forbes at 29:22–29:24.

89. In the course of negotiating the Subject Columbia Policies, Babb put together information on Asten, the insured, and then gave it to DVUA for submittal to Columbia. *See* Tr. 9/22/05 Forbes at 27:10–28:23.

90. Stanley Blaustein was the primary DVUA employee who helped procure the 1981 Columbia Primary Policy. *See* CCC4; CCC6; CCC7.

### c. Insurance Binders

91. An insurance binder is a temporary insurance contract that binds an insurance company to the insurance that is stipulated on the document. *See* P138.[11]

■ 92. Once an insurance policy is issued it supercedes or terminates a binder. *See* P138; Tr. 9/22/06 Forbes at 83:16–83:18.[12]

93. DVUA signed binders on behalf of Columbia. *See* CCC11; P109; Tr. 9/22/06 Forbes at 82:23–83:15, 87:19–88:8.

94. Mary C. Sassaman, a Babb employee, signed binders on behalf of Columbia. *See* P138; Tr. 9/22/06 Forbes at 84:22–85:7.

95. Mary Sassaman had a broker license which allowed her to place insurance with E & SL carriers that Babb did not represent on an agency basis. *See* Tr. 9/22/06 Forbes at 18:9–19:7.

96. Mary C. Sassaman of Babb countersigned the 1979, 1980, 1981, and 1982 American Policies issued to Asten (and several binders issued to Asten) on behalf of American. *See* P1; P2; P3; P4; P129; AMER53; Tr. 9/22/06 Forbes at 81:10–82:9.

97. Babb had an agency agreement with American, a licensed and admitted carrier in Pennsylvania, in the early 1980s. *See* Tr. 9/22/06 Forbes at 74:8–74:10. In the transactions at issue that relationship permitted Babb to submit applications directly to American rather than through an intermediary and to countersign the policies American would issue. *Id.* at 74:11–14 and 96:23–25; Tr. 9/26/06 at 129:22–131:7. No evidence existed that Mary Sassaman

10. An admitted insurer is licensed to transact business in the relevant market for standard or traditional insurance coverages. Typically, an insurer must meet the minimum requirements established by statute to be an admitted insurer in a given state. An E & SL (nonadmitted) carrier is a company that generally underwrites risks or part of risks for which insurance is not available through an admitted company.

11. "It is the custom of the insurance industry, and sound public policy, to provide on-the-

spot temporary insurance coverage in the form of a binder until the application information is verified and a formal policy issued." *Klopp v. Keystone Ins. Cos.,* 528 Pa. 1, 595 A.2d 1, 4 n. 5 (1991).

12. Under Pennsylvania law, a "binder constitutes evidence that insurance coverage has attached at a specific time, and continues in effect until either the policy is issued or the risk is declined and notice thereof given." *Strickler v. Huffine,* 421 Pa.Super. 463, 618 A.2d 430, 433 (Pa.Super.1992).

or Babb represented American during the negotiations of the Subject American Policies.

### 3. Negotiation and Placement of the Policies at Issue

### a. Correspondence and Communications Among the Parties Leading Up to the Placement of the 1981 Columbia Policies

98. On or about March 4, 1981, Asten applied for coverage from Columbia through Babb and DVUA. *See* CCC4. Columbia received information on the "History" of Asten Group, Inc. in the application process, which stated: "The exposure of asbestos from a third party using their materials is virtually nil. We have never had even the slightest hint of a Products Liability claim. None of the exposures from their direct operations have ever been a problem from a marketing or underwriting viewpoint." CCC4.

99. Babb would have obtained the insurance application information primarily from Asten or from Babb's files on Asten. *See* Tr. 9/22/06 Forbes at 33:8–36:1.

100. In a March 4, 1981 cover letter from Stanley Blaustein of DVUA to Mr. David Sayles at Columbia,[13] Blaustein explained that the problem with the Asten account was that it manufactured dryer felts using asbestos up until 1979. He added that "there have been no claims brought against Asten Group from these products however, they have been named in 300 suits in view of their membership between the years 1951 and 1956 in the Asbestos Textile Institute." *See* CCC4.

101. Asten's application package sought products liability coverage either "excluding all claims resulting from asbestos or asbestosis" or with "a large deductible including costs and expense on claims arising from asbestos." *See* CCC4.

102. On March 16, 1981, in response to Asten's application, Columbia's David Sayles responded that Columbia "could not include asbestos claims or coverage" and in order "to offer quotation must have 5 years prod[uct]s loss info." *See* CCC6.

103. Mr. Blaustein responded the next day that "there have been no products liability claims during the last 5 yrs."; rather, "claims reported were due to the insured's membership in the ATI with allegations—they withheld info about danger of asbestos during the 1950s." *See* CCC7.

104. Columbia responded on March 19, 1981, confirming an offer of coverage that "would exclude asbestosis claims and claims arising out of the asbestos textile institute." *See* AMER276; AMER663.

105. On April 2, 1981, Mr. Sayles confirmed to DVUA that Columbia was binding coverage effective April 1, 1981–April 1, 1982 "EXCL. ASBESTOSIS CLAIMS AND CLAIMS ARISING OUT OF THE INSURED'S MEMBERSHIP IN THE ASBESTOS INSTITUTE." *See* AMER283, AMER663; *see also* Dep. Sayles at 62:16–62:20.

106. That same day Blaustien of DVUA signed and sent a binder to Forbes at Babb for the 1981 Columbia Primary Policy and 1981 Columbia Excess Policy confirming that "Coverage excludes all claims arising from asbestos or asbestosis." *See* CCC11.

107. Babb confirmed this understanding to Asten, providing Asten with an insurance binder for the 1981 Columbia Primary Policy detailing the Columbia coverage with "special conditions" that "Coverage excludes Asbestos Products

---

**13.** David Sayles was an underwriter for Columbia from 1976 through March 1982. *See* Dep. Sayles at 11:13–12:25.

and Asbestos Textile Institute." *See* CCC223.

108. In addition, Ms. Forbes sent Asten Confirmations of Coverage regarding the 1981 Columbia Excess Policy and 1981 American Umbrella Policy. The confirmations were on Babb letterhead and read, "In accordance with your instructions, we have effected the insurance described below to protect your interests. Please review this confirmation carefully and advise us immediately if there are any inaccuracies." Below that, each stated that the coverage excluded "Asbestos Products and Asbestos Textile Institute." *See* P138; CCC257.

109. There is no evidence from testimony or from documents that Asten objected in any way to the binders or confirmations of coverage, or about any inconsistency between the binders or confirmations and the policies.

110. The 1981 Columbia Primary and Excess Policies contained the "Asbestosis Exclusion" at issue.

111. Copies of the binder and confirmations were kept with the copies of the policies maintained in Asten's files. *See* AMER30; AMER35; Dep. Gibson at 91:8–17.

112. Sayles, the Columbia representative most involved in the transaction, understood "asbestosis" to refer to all asbestos-related diseases. *See* Dep. Sayles at 62:11–62:20, 64:6–64:15, 31:25–32:9; Dep. Zelman at 98:4–99:22, 124:8–126:13, 128:4–128:19.

113. At the time the policy was issued, Gloria Forbes understood the term "asbestosis" to include all disease processes caused by exposure to asbestos, and thus she understood the "asbestosis" exclusion to bar all claims alleging any such disease. *See* Tr. 9/22/06 Forbes at 39:1–39:6. In dealings generally with retail and wholesale brokers, Ms. Forbes used the word "asbestosis" to encompass all disease processes caused by exposure to asbestos. *Id.* at 39:7–42:2. Ms. Forbes understood that the Asbestosis Exclusion was intended to exclude all asbestos claims.

114. There is no evidence of record to support Asten's theory that Columbia, through Mr. Sayles, intended to exclude only asbestosis, one of several diseases that could be caused by an exposure to asbestos. At least 17% of pending asbestos claims against Asten would have been comprised of mesothelioma and lung cancer cases, yet there was no evidence in the record to reflect that Mr. Sayles undertook any analysis of the pending claims, let alone an analysis of the percentage of non-asbestosis claims, which, according to Asten, would be covered. One would expect to find such an analysis if the Columbia underwriters intended a partial exclusion.

*b.* *Underwriting of the 1981 American Umbrella Policy*

115. American's official underwriting position in April 1981 was to *not* underwrite asbestos risks. *See* AMER290(a). In fact, insurers in general were reluctant to insure known asbestos risks at that time, and typically did not do so. *See* Tr. 9/27/06 Gagan at 47:14–49:24.

116. During March and April 1981, American's coverage for Asten was renewed from the prior year, effective from April 1, 1981 through April 1, 1982, and included the "Following Form Products Liability" endorsement. The 1981 American Umbrella Policy followed form to the 1981 Columbia Primary Policy.

117. All three American policies at issue contain this Following Form Products Liability endorsement. *See* AMER30; AMER60; AMER53.

118. According to the custom and practice in the insurance industry at the time,

all asbestos-related claims were considered "products" claims. *See* Tr. 9/26/06 Zack at 149:8–149:14.

119. Ms. Forbes understood that the 1981 American Umbrella Policy would exclude all asbestos-related disease claims just like the 1981 Columbia policies. *See* Tr. 9/22/06 Forbes at 43:12–44:6 and 49:16–50:1. Ms. Forbes's confirmation to Asten regarding the 1981 American Umbrella Policy clearly stated that understanding: "Excluding Asbestos Products and Asbestos Textile Institute." *See* AMER30; CCC257. This was consistent with how Ms. Forbes described the 1981 Columbia coverage to Asten. *Compare* CCC257 *with* CCC223.

120. The intent of the American Following Form endorsement is reinforced by an August 11, 1983 handwritten memorandum from Gloria Forbes to American wherein she referred to the American policies in place from April 1982 to October 1983 with the statement "you exclude asbestos already." *See* AMER615(a). This document also corroborates Ms. Forbes' recollections of the contracting intent, as also reflected in the binders and confirmations referenced above.

### c. The 1982 Subject Policies

121. The following year, on March 3, 1982, DVUA broker Kathy O'Hagan sent a renewal products application for the Asten policies to Columbia employee, Carmen Valentin. *See* CCC18.

122. In response to the question, "Has any Insurance Company or Underwriter ever refused to issue or cancelled your Products Public Liability Insurance," the following was typed, "Yes—formerly mfg. felts containing asbestos." The answer was bracketed and a handwritten notation next to the answer stated, "we excl." *See* CCC18.

123. The products application also included another "Asten Group History"

identical to the one submitted in 1981, again stating that "The exposure of asbestos from a third party using their materials is virtually nil. They have never had even the slightest hint of a Products Liability Claim." *See* CCC18.

124. Other portions of the products application contained no indication of any claims made or paid or losses outstanding on any of the pre–1981 policies, and the box for "No" was checked in response to questions asking whether the insured is "aware of any incidents not yet reserved, that may result in claims against you." *See* CCC 18.

125. On March 8, 1982, Ms. O'Hagan sent a letter to Columbia underwriter, Mort Zelman, enclosing an umbrella application for the Columbia primary and excess policies that were about to expire and noted that the renewal products application had been mailed to Columbia on March 3rd. *See* CCC20.

126. Next to a question concerning underlying coverage for special hazards, the following was typed: *"All asbestos products and ATI claims excluded."* *See* CCC20 (emphasis added).

127. Ultimately, the 1981 Columbia Primary and Excess Policies were renewed for the policy period running from April 1, 1982 up through October 1, 1983.

128. The 1982 Columbia Policies contained an Asbestosis Exclusion with language identical to that used in the 1981 Columbia Policies.

129. American likewise issued two policies for the policy period running from April 1, 1982 up through October 1, 1983, with limits in excess of the Columbia policies, and, once again, the policies conformed coverage to Columbia's Asbestosis Exclusion.

**F. COURSE OF PERFORMANCE**

*1. Asten's Insurance Recovery Efforts*

*a. Quantity of Asbestos Claims Against Asten*

130. Mr. Young's office has maintained a database of information relating to the asbestos-related claims filed against Asten, which includes the number of new plaintiffs per year. *See* P172; Tr. 7/11/06 Young at 114:21–115:3.

131. The number of plaintiffs who filed new asbestos-related lawsuits against Asten increased over the years and in 1992 Asten experienced a significant increase in the number of claims. For example, in 1978, 146 new asbestos-related claims were filed against Asten, in 1979 140 new claims, in 1980 99 new claims, and in 1981 366 new claims. In 1993, Asten had 762 new claims filed against it, followed by 3,576 new claims filed against it the following year. In 2001, Asten was a defendant in 27,040 new asbestos-related claims. The number of new claims filed against Asten each year from 1978 to 2002 is set forth in Addendum 1, which is attached hereto and made a part of this opinion. *See* P172; Tr. 7/10/06 Finn at 136:7–136:20.

132. The significant increase in the number of asbestos-related claims against Asten during the late 1990s was due to the nature of asbestos-related litigation in several jurisdictions, most notably Texas, in which thousands of plaintiffs would be included in a single complaint. *See* P119; P172; Tr. 7/11/06 Young at 117:14–121:4.

133. Mr. Finn testified that in 1997, the volume of asbestos-related products liability claims that the company was receiving "became a greater concern of the board's than it had in prior years," *see* Tr. 7/10/06 Finn at 136:10–137:1, and by 1998, Mr. Young concurred that the claims "skyrocket[ed]." *See* Tr. 7/11/06 Young at 117:14–18.

*b. 1980 Coverage Action*

134. As noted above, Asten's efforts to access all potentially available coverage for the asbestos-related claims against it included litigation against all of Asten's pre–1981 primary carriers.

135. In 1980, Asten sued every insurer, which had issued or allegedly issued primary liability policies to Asten up to that time, for coverage for all asbestos claims against Asten. Asten sued every carrier whose policies it had copies of, and more.

136. Asten included Zurich Insurance Company as a defendant in the 1980 Coverage Action for policies allegedly issued to Asten by Zurich from 1938 through 1957. Copies of the policy documents were missing, but Asten sued Zurich as part of its effort to establish coverage under those policies.

137. In 1980, Asten amended its prior lawsuit to add Argonaut as a defendant. Argonaut was at that time Asten's primary carrier, with a policy in force from April 1, 1980 to April 1, 1981. Asten sued Argonaut for asbestos-related coverage while the policy was still in force.

138. In 1981–83, during the early years of 1980 Coverage Action, Asten acquired the policies at issue from Columbia and American, but did not add Columbia (a primary carrier) to the suit as it had Argonaut.

139. The 1980 Coverage Action went on for seventeen years. *See* Tr. 7/13/06 Young at 6:25–7:8. *See also* AMER21.

140. Asten continued to litigate with its other primary carriers, but never joined Columbia. Nor did Asten notify American before 2001 that it intended to pursue coverage under American's post-April 1, 1981 coverage.

141. For the 17 years before the 1980 Coverage Action settled and the company began to get reimbursed, Asten absorbed

much of the expense for its defense and settlement of the asbestos claims against it. Asten's pre–1981 primary carriers would not defend the claims in light of the dispute over the trigger of coverage.[14] *See* Tr. 7/13/06 Young at 82:15–88:9; 165–66; CCC300.

142. Asten was reimbursed over $1,000,000 in defense costs alone when it finally settled with the pre-April 1981 primary carriers. *See* Tr. 7/13/06 Young at 165–66. During the pendency of the 1980 Coverage Action, Asten could have held Columbia liable for these amounts for any non-asbestotic claims,[15] according to Asten's theory in this case, but Asten did not pursue Columbia on these defense costs or for indemnity payments.

### c. Notice of Asbestos Claims to Insurers

#### i.) 1980s & 1990s

143. Throughout the 1980s and 1990s, Asten pursued every insurance policy which might have even potentially provided coverage benefits for asbestos claims brought against Asten, except for the Columbia and American policies at issue in this case.

144. This effort began by 1979, with Asten notifying all its primary and excess insurance carriers to that date of the asbestos-related claims against it, demanding a defense and indemnification from its primary carriers, and following up via legal counsel when carriers did not immediately respond or raised objections to coverage. *See e.g.*, AMER178.

145. During this time frame, Asten continued to represent that it provided notice of new suits "to each of the company's liability insurance carriers." *See* CCC61; *see also* Tr. 7/13/06 Young at 59:13–19.

146. In a 1980 letter written by Mr. Young's office to Commerce and Industry Insurance Company, Asten represented: "It has been our policy to apprise Asten–Hill [Manufacturing Company]'s general liability and excess liability carriers of all pending claims, enclosing a photocopy of each Complaint or, where applicable, a Summons filed against Asten–Hill with our notification letter listing specific exposure and manifestation dates alleged by each plaintiff." *See* CCC151.

147. Asten continued to provide notice to all of its pre–1981 primary and excess carriers, including those primary carriers who refused to pay while the 1980 Coverage Action was ongoing, unless the insurers told Asten to stop doing so. *See* CCC159; CCC160; Tr. 7/13/06 Young at 60:11–64:25.

148. During the 17 years that the 1980 Coverage Action was ongoing, and even after the number of asbestos claims increased dramatically in 1999, Asten neither tendered a claim to nor notified Columbia of any asbestos-related suit.[16]

14. *See supra* Part II.D.2 (describing the dispute in the 1980 Coverage Action over what event triggered an insurer's liability for coverage for an asbestos-related case against the insured and the Pennsylvania Supreme Court's resolution of the dispute in *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993), with its adoption of the multiple-trigger theory).

15. The term "non-asbestotic claims" is used in this opinion to mean claims that allege injuries that do not include the specific, singular disease asbestosis (as that term is defined medically). *See infra* Part III.D.2.

16. Columbia's policies obligated Asten, "[i]n the event of an occurrence," to provide "written notice ... as soon as practicable." In addition, "[i]f claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." CCC229; CCC277.

149. Beginning in 1979, Asten began to forward asbestos-related claims to American. P12; Tr. 7/11/06 Young at 105:1–108:1.

150. Prior to late 2001, however, the notice's Asten sent to American about the underlying asbestos claims did not reference American's post-April 1981 coverage.[17]

151. Between July 1986 and September 1990, American repeatedly confirmed to Asten that it had been notified of pending asbestos-related litigation against Asten and that both the pre–1981 and post–1981 American policies may be involved. *See* AMER402, AMER403, AMER404, AMER405, AMER406, AMER422, and AMER437.

152. Since 1986, American reserved its rights under all five policies it sold to Asten, and periodically requested asbestos-related claims information with regard to all five policies.[18] *Id.*

### ii.) Asten's Policy Registers

153. In 1984, during the course of AJN's first insurance coverage litigation, AJN retained an "insurance archaeologist" from England to review AJN's available insurance policies. The archaeologists prepared a Register of Excess Liability Policies and a Register of Primary Liability Policies. The registers covered all primary and excess liability policies issued between 1963 and 1984. The Registers include the policies at issue and quote the Asbestosis Exclusion. *See* P205; P206: Tr. 7/11/06 Young at 96:5–97:7.

154. Asten was fully aware during the course of the 1980 Coverage Action of the Subject Policies and the language of its exclusion.

### iii.) Recent Efforts Involving Defendants

155. Beginning in 2001, Asten began contacting the defendants to advise them that Asten's pre–1981 primary coverage was about to exhaust and to seek coverage from the Insurance Companies under the policies at issue. *See* Tr. 7/12/06 Young at 61:17–62:6.

156. In March 2002, Asten stated in a correspondence that it considers coverage available for "non-asbestosis" asbestos-related claims under the Subject Policies. *See* P26.

157. Asten first notified Columbia about the underlying asbestos lawsuits and tendered its first claims on the subject

---

17. Asten notified American of the existence of the underlying asbestos claims pursuant to the American excess policy in force for the period April 1, 1979 to April 1, 1980. *See* AMER178. Asten sent a series of notification letters to American between 1979 and 2001. The letters, however, never referenced the American policies at issue. *See* AMER670; AMER672; AMER674; AMER677. Asten did not pursue coverage under the American policies at issue and did not make any statement to American that the policies at issue might owe coverage for the asbestos-related claims (until late 2001). American assumed that Asten's claim notifications applied to all of the American policies issued to Asten. These factual findings are relevant for two separate legal principles and it is important to distin-

guish Asten's post-policy conduct from American's recognition of Asten's notices as relating to all of its policies. The former is relevant in the interpretation of the policies and the parties' course of performance under the Subject Policies; the latter is relevant with respect to American's late notice and laches defenses.

18. The 1981 and 1982 American Umbrella Policies obligated Asten to provide notice "as soon as practicable" for "an occurrence ... reasonably likely to give rise to a claim under this policy" and the 1982 American Excess Policy required notice "immediately" for "any occurrence or disaster which will probably result in liability under this policy." *See* AMER30; AMER60 and AMER90 together; AMER53.

Columbia primary policies on October 15, 2001. *See* CCC48.

158. On January 14, 2002, Columbia's claims handler, James Nagy, wrote to AJN's counsel and stated that he had located a copy of an AJN policy and that the policy contained an "Asbestos Exclusion" and that based upon the "Asbestos Exclusion," Columbia would "not participate in the defense or indemnity of any claims filed against AJN." *See* P103.

159. When asked why Asten did not notify Columbia of the underlying asbestos claims prior to 2001, Mr. Young testified that he believed, under the then-prevailing or trending law, that Asten would ultimately be entitled to "pick and choose" [19] from among any carrier that was on the risk at the time of (a) the plaintiff's exposure to asbestos; (b) the progression of the asbestos-related injury within the plaintiff; or (c) the manifestation of the plaintiff's asbestos-related injury (the so-called "triple-trigger theory" or "multiple-trigger theory"). *See supra* Part II.D.2 (discussing the adoption of the multiple-trigger theory in Pennsylvania in *J.H. France*). As a result, there was no requirement that he tender a claim to Columbia while other policies on the risk during any one of the triggers were still available. *See* Tr. 7/12/06 Young at 193–95.

160. The Pennsylvania Supreme Court did not adopt the "triple-trigger" and "pick and choose" theories for asbestos-related claims until 1993 in *J.H. France.*

161. Accordingly, before 1993, it would have been risky and rare for an insured not to tender claims in a timely fashion to all carriers potentially on the risk during any one of the three trigger periods. *See* Tr. 9/22/06 Jordan at 201:17–206:9.

162. In this time frame, it was a universal practice in environmental liability cases to notify all potential carriers because of the uncertainty as to which policy may provide coverage. *See* Tr. 9/22/06 Jordan at 205:2–206:9.

163. Asten took a very conservative approach in preserving available insurance coverage. *See* Tr. 7/10/06 Finn at 141–142. The pre–1981 policies covered all asbestos-related diseases whereas the Subject Columbia Policies, according to Asten, excluded only asbestosis. In order to preserve its coverage for asbestosis under the pre–1981 policies, Asten early on should have sought coverage under the Subject Policies for non-asbestotic diseases rather than tender such claims to, and thereby reduce, the available aggregate coverage under the pre–1981 policies. *See* Tr. 7/11/06 Finn at 41–44.

*iv.) Result of Late Notice to Defendants*

164. The notice provisions in the Subject Policies are included to: (1) enable an insurer to defend timely to avoid default; (2) enable an insurer to control defense; (3) enable an insurer to set reserves; (4) allow an insurer to address pricing issues on policy as well as books of business; (5) enable effective underwriting of renewal policies; and (6) permit an insurer to seek assistance from the Court if the meaning of policy language is in dispute. *See* Tr. 9/22/06 Jordan at pp. 195–197; *supra* Part

---

**19.** In *J.H. France,* the Pennsylvania Supreme Court held that if under the multiple-trigger theory of liability for underlying asbestos-related claims several insurers are deemed to be on the risk, the insured can choose which insurer to indemnify it. In other words, "[a]ny policy in effect during the period from exposure through manifestation must indemnify the insured until its coverage is exhausted." *J.H. France,* 626 A.2d at 509. "When the policy limits of a given insurer are exhausted, [the insured] is entitled to seek indemnification from any of the remaining insurers which was on the risk during the development of the disease."

II.C (detailing notice provisions in each of Subject Policies).

165. Asten waited 20 years—until October 15, 2001 when it had already settled the coverage action with its other primary carriers—to tender a claim and/or notify Columbia of the underlying asbestos claims. Expert witness Richard Jordan credibly testified that this was "perhaps one of the most egregious examples of late reporting" he had seen.

166. The only two Asten employees having any involvement and/or independent knowledge about procuring insurance for the company during the early 1980s, John Flynn and Gerald Chapman, have either died or were too ill to participate in a deposition. See CCC220; CCC40.

167. Mr. Chapman was also the Asten employee most involved in the company's decisions concerning claims notification, the 1980 Coverage Action, and Asten's history of recording and reporting claims to Asten's Board and to Asten's auditors.

168. Stanley Blaustein of DVUA, the principal of that firm involved in the initial Columbia placement and who signed the "Binder" confirming the intent to exclude all "asbestosis or asbestos" claims, see CCC11, died before his deposition could be taken in this case. See CCC219A;CCC220.

169. Other key witnesses like Mr. Sayles, Mr. Zelman, and Ms. Forbes could not recall the specifics of the circumstances and discussions relating to the negotiation and procurement of the Subject Columbia Policies.

170. Subpoenas in this case to Babb and DVUA were returned without production of any documents in light of destruction of their files in the 1980s pursuant to their regular document retention policies. See CCC221; CCC259. Babb's Gloria Forbes testified that Babb's files would have contained documentation of communications with the insurers and Asten regarding the policies at issue. See Tr. 9/22/06 Forbes at 19:17–20:12.

d. Swiss Re Policy

171. As a result of Asten's merger discussions with Johnson Company, which were finalized in 1999, AJN asked Mr. Young to do a coverage analysis as to all insurance coverage that may be available to pay AJN's asbestos-related claims. As part of its analysis, Mr. Young's firm prepared a coverage chart reflecting AJN's insurance coverage. See P203; Tr. 7/10/06 Finn at 137:5–138:9; Tr. 7/11/06 Young at 97:8–98:15.

172. As a condition of the merger between Johnson and AJN, Johnson Company required that Asten purchase additional insurance to cover potential asbestos claims. See Tr. 7/10/06 Finn at 142:23–144:9.

173. As a result of Johnson's demand regarding insurance coverage during the merger discussions, Asten obtained an aggregate excess of loss insurance policy from Swiss Reinsurance Company ("Swiss Re") for the potential future payment of asbestos-related claims. See Tr. 7/10/06 Finn at 144:10–145:14.

174. The cost of the Swiss Re policy was $31,000,000, to be paid in ten annual installments of between $1,000,000 and $5,000,000 per year. See CCC276.

175. In Schedule A of the Swiss Re policy, listing other previous policies issued to Asten, the caption over the Subject Columbia Policies and the Subject American Policies reads: "The insurers referenced below may maintain that they have exclusionary language requiring an interpretation of the Insured's rights for coverage for asbestos-related claims." See CCC276.

176. Mr. Finn could not explain why Asten expressed this concern in February

2000, more than 19 months before Asten first notified Columbia of the underlying asbestos-related claims and Columbia first denied coverage. *See* Tr. 7/11/06 Finn at 24:23–26.

177. The Swiss Re policy is structured so that the policy can be cancelled at any time and the premium payments are refundable plus interest, less the cost of any claims actually paid. *See* CCC56; Tr. 7/11/06 Finn at 16:2–16:13.

178. The Swiss Re policy is excess of any coverage available under the Columbia and American Policies. *See* CCC276.

2. *Asten's Internal Documents—History of Recording and Reporting Asbestos Litigation, Insurance Claims, and Available Insurance Coverage*

179. Throughout the 1980s and 1990s, Asten's internal financial documents and audit letters did not count the coverage at issue as part of the insurance available to Asten to handle the asbestos-related claims against it.

180. Throughout the 1980s and 1990s, Asten, through its Vice President Gerald Chapman, regularly kept its board members apprised of the volume of asbestos lawsuits being filed against the company, the available insurance that could be tapped into to cover the defense and indemnity of these lawsuits, and of the status of the 1980 Coverage Action. *See* Tr. 7/10/06 Finn at 122:7–10, 129:22–130:22, 135:18–136:1; CCC55; CCC56; CCC63.

181. Mr. Young also annually reported to the Asten Board on the volume of asbestos litigation against Asten. *See* Tr. 7/10/06 Finn at 135:24–136:1

182. At no time during this period did Mr. Chapman identify the amounts of coverage associated with the Subject Columbia Policies or the Subject American Policies. Instead, the reported figures represented the policy limits of only the pre–1981 primary and excess carriers. *See* CCC55; CCC56; CCC63.

183. For approximately 8 years, Asten reported to its auditors its unexhausted insurance coverage that could defend or indemnify the underlying asbestos-related suits. The reports consisted of the available coverage under all the pre–1981 policies. Asten failed to report to its auditors and include in its audited financial statements any reference to the Subject Columbia Policies or the Subject American Policies or their respective policy limits, with no explanation given for this omission. *See* CCC300; Tr. 7/11/06 Finn at pp. 7–18.

184. As late as December 29, 2001, Asten's financial statement reflected total primary policy limits of $21.2 million (or all of Asten's pre–1981 primary policies) of which $1.25 was then "remaining" and excess policy limits of $47 million (or all of Asten's pre–1981 excess policies). *See* CCC56; Tr. 7/11/06 Finn at 18:12–19:23.

185. Moreover, that same statement included a reference to the 1999 Swiss Re Policy's limits of $50 Million. *See* CCC56; Tr. 7/11/06 Finn at 17:23–18:6. By contrast, there was no mention of the Subject Columbia Policies or the Subject American Policies and no witness testifying on behalf of Asten could offer a valid explanation for this omission.

186. As late as 1998, when responding to interrogatories served on Asten in the underlying asbestos cases, Mr. Young did not include the Subject Columbia Policies in answers to questions requesting information concerning available insurance coverage.

3. *Proposed Policy Renewal in 1983*

187. When the time came for the Subject Policies to be renewed in 1983, DVUA contacted Columbia and Babb contacted American to gauge the insurers' interest in

renewal. Columbia and American were sent renewal applications from Asten for their consideration. *See* AMER68A; AMER615A.

188. In the renewal application for the proposed American policy, Ms. Forbes referenced a proposal to renew the Columbia primary policy for a period running from October 1, 1983 through October 1, 1984 and indicated that the policy "excludes asbestos related claims." *See* AMER615A.

189. On August 24, 1983, DVUA broker Ed Levy sent a renewal products application to then Columbia underwriter Rick Crane. *See* AMER68A.

190. As with the 1982 renewal products application, next to the phrase "formerly mfg. felts containing asbestos," there was a handwritten notation stating "excluded in policy already." *See* AMER68A.

191. The application included another "Asten Group History" with the same recitations concerning Asten's negligible exposure and its sole liability relating to its affiliation with the ATI. However, the number of suits—previously stating 270—was crossed out and the number 650 was substituted by hand. *See* AMER68A.

192. On September 13, 1983, Mr. Crane sent a telex to Mr. Levy stating that Columbia was "very interested in quoting primary umbrella" which would have included the Asbestosis Exclusion contained in the expiring policies. *See* CCC124.

193. However, Asten ultimately purchased a primary policy with St. Paul Surplus Lines for the policy period between October 1, 1983 and October 1, 1984. *See* AMER69.

194. The St. Paul Policy contained the following asbestos exclusion: "It is hereby understood and agreed that this policy shall not apply to any and all liability for past, present or future claims arising out of the manufacture, distribution, installa-tion or handling of asbestos or products containing asbestos materials." *Id.*

## G. TRADE CUSTOM AND USAGE OF THE WORD "ASBESTOSIS"

195. Asbestosis is a chronic, progressive inflammation of the lung. It is not contagious.

196. Columbia's expert witness, Richard Jordan, testified that there were two meanings to the term "asbestosis" in the early 1980s.

197. Technically, asbestosis denoted a poorly defined range of ailments generally characterized by fibrotic injury, as opposed to cancerous injury.

198. According to Mr. Jordan, in the 1981–1982 time period, the term "asbestosis" was also used by insurance personnel, particularly within the underwriting community to "refer to the whole panoply of diseases." Tr. 9/22/06 Jordan at 133:22–134:25. Mr. Jordan testified that during the period of 1980 to 1985, it was common in the industry to hear the term "asbestosis" "numerous times, I mentioned, hundreds of times to mean the panoply, of diseases caused by asbestos." *Id.* at 112:23–113:21. He has also seen the term asbestosis used as an improper spelling of the mineral asbestos. *Id.* at 113:21–24. He added that he had never seen an underwriter try to provide coverage for one disease while excluding other diseases related to asbestos. *Id.* at 149:22–149:25.

199. Mr. Jordan testified that virtually no asbestos-related claims allege only a single disease known as asbestosis. He further testified that partial exclusions were not written for asbestos because an underwriter could not make such an exclusion effective. Virtually every claim would have to be defended because there would be a potential that it might include some injury besides "asbestosis," especially

where there was no clear consensus what that condition included or excluded. Moreover, once defended, as a practical matter, carriers would have to indemnify most cases because the cost of settling cases is often less than the cost of defending them through trial, and given the risk of potential verdicts. The exclusion would exclude virtually nothing. *See* Tr. 9/26/06 Jordan at 120. Mr. Jordan's conclusions are supported by evidence and considered credible by this court.[20]

200. American's expert witness, Brian Gagan, testified that it was custom and practice in the industry that "asbestosis," when used in insurance policies, was a shorthand term for all asbestos caused diseases. *See* Tr. 9/27/06 Gagan at 30:5–30:13.

201. Mr. Gagan testified that it was virtually impossible to buy partial coverage in the early 1980s for asbestos-related claims for a company like Asten (a company that had distributed asbestos-containing products and been sued repeatedly in asbestos-related tort law suits) through a broker like Babb where the insurer knew the facts. Based on his experience as a broker seeking coverage on behalf of commercial insurance applicants in the early 1980s, he opined that carriers would not consider writing partial coverage because asbestos had become largely uninsurable by that time, at least for a company that had been sued and identified as an asbes-

tos claims risk. *See* Tr. 9/27/06 Gagan at 47:14–49:24. This court finds these opinions of Mr. Gagan supported by the evidence and credible.

202. Professionals involved in asbestos claims and coverage used the term "asbestosis claims" to refer to all asbestos-related claims. *See, e.g.,* AMER241 (August 1, 1980 letter re "Asbestosis Insurance Coverage Conference").

203. High-level personnel at Fireman's Fund Insurance Company, American's corporate parent, used the term "asbestosis" to refer generally to all asbestos-related claims. *See* AMER155; AMER160.

204. Various Columbia Casualty Company personnel testified that the term "asbestosis," when used in insurance policies, was a shorthand term for all asbestos-related bodily injury, harm, and/or claims. *See* Sayles Dep. at 45:6–46:1; Zelman Dep. at 128:4–128:19; Crane Dep. at 47:19–48:18; Nagy Dep. at 51:3–51:20; Lundberg Dep. at 76:10–76:13.

205. Columbia's David Sayles and Mort Zelman, the underwriters involved in underwriting the Columbia policies, testified that in 1981–1982 they were instructed by Columbia not to sell insurance covering asbestos-related risks. *See* Sayles Dep. at 62:11–64:15; Zelman Dep. at 128:4–128:19.

206. American's personnel testified that it was custom and practice in the industry that "asbestosis," when used in

---

**20.** The plaintiff's expert witness Dennis Connolly testified that the Asbestosis Exclusion is a form of "laser exclusion" drafted to exclude Asten's liability relating to Asbestos Textile Institute claims, as well as to exclude "frequency claims" that allege the specific disease of asbestosis. According to Mr. Connolly, frequency claims are those that are filed often against an insured, but are of low cost or value. Mr. Connolly further testified that there was a "soft market" at the time that the Subject Columbia Policies were underwritten and that, as such, it was not unusual for

insurers to partially underwrite a risk like asbestos products claims by using a laser exclusion to exclude the frequent asbestosis injury claims and to include the "severe" asbestos-related diseases claims. The court does not find Mr. Connolly's testimony to be convincing. While Mr. Connolly has lengthy experience in the insurance industry and testified to many points that provided helpful background in this case, his laser exclusion theory was not supported by the evidence and was clearly outweighed by the testimony of the defendants' experts.

insurance policies, was a shorthand term for all asbestos-related bodily injury, harm, and claims. *See* Ibello Dep. at 21; Koehn Dep. at 147–48, 154.

207. Asten employees Krupnick and Chapman, Asten's attorney James Young, and counsel for Asten's primary carriers Allstate, INA, Cigna, and Fireman's Fund used the term "asbestosis" as a reference to all the asbestos-related claims against Asten. *See* AMER177; AMER186; AMER224; AMER241; AMER225; AMER226; AMER238; AMER232; AMER352.

208. In the early 1980s, several insurance companies, including Granite State Insurance Company and California Union Insurance Company, used asbestos exclusions that distinguished the several diseases caused by asbestos exposure. The Granite State Insurance Company policy excluded claims alleging "manifestation of any asbestos related injury, including (but not limited to) asbestosis, mesothelioma, and/or broncheogenic carcinoma." The California Union Insurance Company asbestos exclusion stated: "It is agreed that this Policy shall not apply to claims arising out of the manufacture and/or distribution of Asbestos products or products containing Asbestos Fibre and all claims resulting from Asbestosis or any other Asbestos related injuries or diseases." *See* Tr. 9/27/06 Gagan at 79:15–79:23. *See also* P92, P93, P94, P95, P96, P97, P98.

### H. The Stub Issue—the Aggregate Limits of the April 1982 to October 1983 Policies

*1. 1982 Columbia Policies*

209. The 1982 Columbia Primary Policy runs from April 1, 1982 through October 1, 1983 and states, in an endorsement entitled "Combined Single Limit of Liability," that its limits of liability are "$1,000,000 each occurrence as respects bodily injury liability or property damages liability or both combined" and "$1,000,000 aggregate" and "the total liability of the company for all damages because of all bodily injury and property damage shall not exceed the limit of liability stated in this endorsement as 'aggregate.'" *See* CCC229.

210. The 1982 Columbia Excess Policy runs from April 1, 1982 through October 1, 1983 and, as set forth in Column 1 of the policy's declarations page, contains policy limits of $10,000,000 in excess of the limits of liability set forth in an underlying excess liability policy issued by American. *See* P9.

211. The 1982 Columbia Excess Policy further provides that the policy "shall apply only to those coverages for which a limit of liability is inserted in Column 1 provided further that the limit of the company's liability under this policy shall not exceed the applicable amount inserted in Column 1" (which, as noted in the above paragraph, refers to a $10,000,000 aggregate).

212. Further, the insuring agreement in the 1982 Columbia Excess Policy provides as follows:

> The provisions of the immediate underlying policy are incorporated as a part of this policy *except* for any obligation to investigate and *defend and pay for costs and expenses incident to the same, the amounts of the limits of liability,* any 'other insurance' provision *and any other provisions therein which are inconsistent with the provisions of this policy.*

*See* P9 (emphasis added).

*2. 1982 American Policies*

*a. 1982 American Umbrella Policy*

213. 1982 American Umbrella Policy contains the Insured Retained Limit provision noted above. *See supra* Part II.C.2.c. The last sentence of that section of the

policy states: "The annual periods of this policy are each year beginning with the inception date as shown in # 2 of the declarations." *See* P4; AMER60.

214. The policy, written for 18 months, contained no complete second year. *See* Tr. 9/19/06 Forsman at 147:8–152:7.

#### b. *1982 American Excess Policy*

215. The 1982 American Excess Policy, issued for the period April 1, 1982 to October 1, 1983, provides as follows:

> The insurance afforded by this policy is subject to the same warranties, terms (*including the terms used to describe the application of the limits of liability*), conditions and exclusions as are contained in the underlying insurance on the effective date of this policy, except unless otherwise specifically provided in this policy, any such warranties, terms, conditions or exclusions relating to premium, the obligation to investigate and defend the amount and limits of liability and any renewal agreement.

*See* AMER53 (emphasis added).

216. The "Underlying Insurance" as stated in Item 7 of the 1982 American Excess Policy, is "Fireman's Fund Policy No. TBD." *See id.* Thus, the policy to which the 1982 American Excess Policy followed form to was the 1982 American Umbrella Policy.

217. Credible expert testimony at trial stated that according to ordinary insurance industry practice at the time, if a policy does not specify that a second aggregate limit is available for a period of more than one year, but less than two years, there is only a single aggregate limit. *See* Tr. 9/26/06 Zack at 161:8–161:24.[21]

218. On March 11, 1982, Gloria Forbes of Babb sent a Memorandum to American requesting that the 1982 American Umbrella and Excess Policies each be written for an 18–month term, each for one premium, and each providing one aggregate limit of $10,000,000. *See* AMER309.

219. As part of correspondence relating to Asten's tender of claims, Asten's outside counsel, Mr. Young, sent a letter to American on March 1, 2002 identifying the 1982 American Excess Policies as having $10 Million limits each—not $20 Million in limits each. *See* P26.

### I. DUTY TO DEFEND UNDER THE EXCESS POLICIES

#### 1. *Columbia Excess Policies*

220. The insuring agreements in the Columbia Excess Policies provide as follows:

> The provisions of the immediate underlying policy are incorporated as a part of this policy *except for* any obligation to *investigate and defend and pay for costs and expenses incident to the same, the amounts of the limits of liability, any 'other insurance' provision and any other provisions therein which are inconsistent with the provisions of this policy.*

*See* P7 and P9 (emphasis added).

221. The insuring agreements in the Columbia excess policies provide that Columbia will indemnify the insured for the amount of "loss" in excess of the applicable limits of liability of the underlying American umbrella policies. *See* P7 and P9.

222. "Loss" is further defined in the Columbia excess policies as "the sums paid as damages in settlement of a claim or in

---

**21.** For example, when American issued an extension to Asten for American's policy in effect from October 1, 1983 to October 1, 1984, extending the policy to January 1, 1985, American specifically stated that the three month extension would carry with it a separate, new aggregate limit. *See* Tr. Zack 9/26/06 at 162:9–163:4. No such statement was made in connection with the issuance of American's 1982 Umbrella or Excess Policies.

satisfaction of a judgment for which the insured is legally liable after making deductions for all recoveries, salvages and other insurances.... *'Loss' does not include investigation, adjustment, defense or appeal costs, expenses and costs and expenses incident to any of the same, notwithstanding that the underlying insurance may provide insurance for such costs and expense."* *See* P7 and P9 (emphasis added).

### 2. American Excess Policy

223. American does not contest that there is a duty to defend covered claims under the 1981 and 1982 American Umbrella Policies.

224. The language of the 1982 American Excess Policy does not impose a *duty* to defend or pay defense costs on American. *See* AMER53; *see also* Tr. 9/26/06 Zack at 164:24–166:7; *supra* Part II.C.2 (discussing the difference between an umbrella policy and excess policy).

225. 1982 American Excess Policy provides that American indemnifies Asten for its "ultimate net loss" in excess of underlying insurance. Ultimate net loss is defined in the policy as follows:

"Ultimate net loss" means all sums actually paid or which the Insured is legally obligated to pay as damages in settlement or satisfaction of claims or suits for which insurance is afforded by this policy, after proper deduction of all recoveries or salvage.

*Id.* This language does not include defense costs.

226. Paragraph 2 of the Conditions of the 1982 American Excess Policy provides in relevant part as follows:

*Notice of Occurrence.* The Insured shall immediately advise the Company of any occurrence or disaster which will probably result in liability under this policy. *The Company shall not however, be called upon to assume charge of the settlement or defense of any claims made, or suits brought, or proceedings instituted against the Insured,* but shall have the right and opportunity to be associated with the Insured in the defense and trial of any such claims, suits or proceedings relative to any occurrence which, in the opinion of the Company, may create liability on the part of the Company under the terms of the policy ....

*Id.* (emphasis added). This language gives American the right but not the obligation to participate in the defense.

227. Paragraph 4 of the Conditions part of the 1982 American Excess Policy reads in relevant part as follows:

*Payment of Expenses. Loss expenses and legal expenses including court costs and interest, if any, which may be incurred by the Insured with the consent of the Company in the adjustment or defense of claims, suits or proceedings shall be borne by the Company and the Insured* in the proportion that each party's share of loss bears to the total amount of said loss. Loss expense hereunder shall *not include salaries and expense of the Insured's employees* incurred in investigation adjustment and litigation.

*Id.* (emphasis added). This language only applies to defense costs incurred with American's consent. American is not obligated to consent.

228. Nowhere does the policy state that American *must* consent to reimburse defense expenses incurred by the insured.

229. The "follow form clause" of the 1982 American Excess Policy appears in the Conditions portion of the policy under the heading "Maintenance of Primary Insurance." The follow form language states:

The insurance afforded by this policy is subject to the same warranties, terms (including the terms used to describe the application of the limits of liability), conditions and exclusions as are contained in the underlying insurance on the effective date of this policy, *except*, unless otherwise specifically provided in this policy, any such warranties, terms, conditions or exclusions relating to premium, *the obligation to investigate and defend*, the amount and limits of liability, and any renewal agreement.

*Id.* (emphasis added). Thus, the provisions regarding any "obligation to investigate or defend" which may be contained in the underlying 1982 American Umbrella Policy, to which the 1982 American Excess Policy follows form, are not incorporated into the 1982 American Excess Policy.

## III. CONCLUSIONS OF LAW with DISCUSSION

### A. JURISDICTION, VENUE, AND GOVERNING LAW

1. The subject matter jurisdiction of this Court is based upon 28 U.S.C. § 1332, in that there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to this action occurred in this District, and American and Columbia both reside in this District.

3. A federal district court, sitting in diversity, must apply the choice-of-law rules of the state in which it sits. *See St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 n. 3 (3d Cir.1991) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). This action was filed in the Eastern District of Pennsylvania and the parties agree that Pennsylvania substantive law applies. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 228–29 (3d Cir.2007) (discussing Pennsylvania's contract choice-of-law rules and reaffirming its prediction in *Melville v. American Home Assurance Co.*, 584 F.2d 1306 (3d Cir.1978), that the Pennsylvania Supreme Court would apply the *Griffith v. United Air Lines Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), "interests/contacts" approach to contract disputes).

### B. LACHES

#### 1. Equitable Doctrine of Laches—In General

4. Asten's coverage suit against Columbia is barred under the doctrine of laches.

■ 5. Laches is an equitable remedy. It consists of two essential elements: (a) inexcusable delay in prosecuting a suit, and (b) prejudice to the adverse party. *Central Penn. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1108 (3d Cir.1996). *See Kern v. Kern*, 892 A.2d 1, 9–10 (Pa.Super.2005) ("The doctrine of laches is an equitable bar to the prosecution of stale claims and is the practical application of the maxim that those who sleep on their rights must awaken to the consequence that they have disappeared." (citation and quotations omitted)).

■ 6. "The application of the equitable doctrine of laches does not depend upon the fact that a definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice." *United Nat'l Ins. Co. v. J.H. France Refractories Co.*, 542 Pa. 432, 668 A.2d 120, 124 (1995).

■ 7. "The question of whether a party exercised 'due diligence' in pursuit of a claim is not what a party knows, but what the party may have known by the use

of information within their reach." *Kern,* 892 A.2d at 9–10.

■ 8. "It is well-settled law that the doctrine of laches is applicable peculiarly where the difficulty of doing justice arises through the death of the principal participants in the transactions complained of, or of the witnesses ... to the transactions, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible." *Id.* at 10.

■ 9. "Laches is, of course, an affirmative defense to a claim, and the party asserting it bears the burden of proof." *Cook v. Wikler,* 320 F.3d 431, 438 (3d Cir.2003).

### 2. Columbia's Laches Defense

■ 10. Columbia has satisfied its burden and demonstrated that this coverage action against it should be barred under the doctrine of laches.

11. Under the first prong ("inexcusable delay"), Asten inexplicably did not join Columbia to its 1980 Coverage Action. Asten had previously amended its complaint in that action to join Argonaut, but it did not do the same for Columbia. And during the course of the 1980 Coverage Action the insurance archaeologists reminded Asten of the Subject Columbia Policies and their exclusions, but Asten did not join Columbia to the action.

12. Asten's failure to notify Columbia of its hundreds of underlying asbestos-related claims (despite the notice requirement of the Columbia primary policies,[22]

the general practice of the industry to do so, and Asten's notice to all pre–1981 insurers) prevented Columbia from fully assessing its rights and duties under its insurance contracts or from making a responsible coverage decision at the appropriate time. In this case, the "appropriate time" would have been at or near the time the asbestos-related claims were asserted against the insured (Asten), not twenty years later.

13. And although under the *J.H. France* decision an insured is allowed to "pick-and-choose" what insurer will respond to its liabilities under the triple-trigger theory, twelve years elapsed between the initial Columbia policy and the *J.H. France* decision. During that twelve year period, Asten's failure to tender to Columbia the underlying complaints was not only risky on Asten's part, but demonstrated a "want of due diligence" and was an unjustified delay.[23] Moreover, in 1999, in connection with the Swiss Re policy, Asten acknowledged its belief that the defendants may dispute the construction of the Asbestosis Exclusion, but it waited an additional two years to notify Columbia of the underlying claims.

14. Under the second prong ("prejudice"), Columbia was significantly prejudiced by Asten's unfair delay in bringing this action. As Columbia's expert Mr. Jordan persuasively explained, Asten's delay prejudiced Columbia because it prevented Columbia from adequately setting reserves and addressing pricing issues on policies as well as books of business.

---

**22.** "If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." CCC229; CCC277.

**23.** It is Columbia's denial of coverage that led Asten to file this declaratory action. There-

fore, by Asten waiting to tender or notice claims to Columbia, it delayed Columbia's denial of coverage, which delayed Asten from filing this action. Therefore, the delay in tendering claims to Columbia during this time period is no different than delaying the prosecution of this declaratory action.

15. There has been substantial prejudice to Columbia in its ability to investigate and litigate this coverage action. The persons solely responsible for having first hand knowledge of Asten's procurement of the Subject Columbia policies, John Flynn and Gerald Chapman, and DVUA broker Stanley Blaustein were unavailable to participate in depositions. Other key witnesses like Mr. Sayles, Mr. Zelman, and Ms. Forbes could not recall the specifics of the circumstances and discussions relating to the negotiation and procurement of the Subject Columbia Policies. A number of relevant documents in connection with the issuance of the Subject Columbia Policies have been lost or destroyed. For example, any documents maintained by Babb and DVUA concerning the Subject Columbia Polices would have been destroyed in the late 1980s under the brokers' document retention policies. *See Class of Two Hundred Admin. Faculty Members v. Scanlon,* 502 Pa. 275, 466 A.2d 103, 105 (1983) ("The prejudice required is established where, for example, witnesses die or become unavailable, records are lost or destroyed, and changes in position occur due to the anticipation that a party will not pursue a particular claim.").

16. Columbia has been prejudiced in its ability to pursue several of its counterclaims and affirmative defenses. In particular, I am unable to give full consideration to Columbia's claim for rescission because of the lack of evidence illustrating Asten's bad faith or knowing fraud in the insurance acquisition process. *See part infra* Part III.G.1. Asten made a false statement on its application to Columbia, but Columbia cannot establish Asten's intent in 1981. Proof of a party's intent is always difficult, but Asten's twenty-year delay has made the task nearly impossible.

17. Asten knew of the Columbia policies and it knew of the language of the Asbestosis Exclusion and the notice provisions. Asten behaved for twenty years as though Columbia's coverage under the Subject Columbia Policies did not extend to the underlying asbestos-related claims. It was only after the near exhaustion of its pre–1981 primary insurance policies that Asten gave any indication that it believed the Columbia policies would apply to the underlying claims. The filing of this coverage action appears to be a last ditch effort by Asten to use the passage of time to its advantage to obtain tens of millions of dollars worth of insurance coverage that it is not entitled to. The equitable doctrine of laches bars such a complete lack of diligence in seeking relief from being rewarded when it results in substantial prejudice to the defendant. Accordingly, the doctrine of laches bars Asten's coverage claim against Columbia.

### 3. American's Laches Defense

18. American fails to overcome its burden to bar the coverage action against it under the doctrine of laches.

19. American failed to show unexplained delay on Asten's part in pursuing this coverage action against it. The 1980 Coverage Action involved only Asten's primary carriers. American received notice from Asten of the underlying claims starting in 1979. Based on letters Fireman's Fund sent to Asten between 1986 and 1990, American treated any of the underlying asbestos-related claims Asten tendered or noticed to it as applying to all of its policies with Asten. *See also Trustees of Univ. of Pa. v. Lexington Ins. Co.,* 815 F.2d 890, 898 (3d Cir.1987) ("Unlike primary insurers, excess insurers have no right to control a lawsuit and thus have less need for early notice. Moreover, because primary insurers will usually provide an experienced defense, the likelihood of prejudice from late notice is more remote.")

## C. AGENCY RELATIONSHIPS IN THE PLACING OF ASTEN'S INSURANCE

■ 20. The party asserting an agency relationship "has the burden of proving it by a fair preponderance of the evidence." *Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.*, 412 Pa.Super. 140, 602 A.2d 1348, 1351 (1992).

■ 21. "The basic elements of agency are 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Scott v. Purcell*, 490 Pa. 109, 415 A.2d 56, 60 (1980) (quoting RESTATEMENT (SECOND) OF AGENCY § 1 cmt. b (1958)).

■ 22. Apparent authority is the "power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted," for instance where "the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power." *Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 246 A.2d 407, 410 (1968).

■ 23. If a court determines an individual or entity is an agent of another, the actions and knowledge of the agent are binding on that person, the principal. *See Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mut. Ins. Co.*, 641 F.Supp. 297, 303 (E.D.Pa.1986).[24]

■ 24. In the insurance realm, an insurance agent is a person authorized "to solicit insurance and negotiate policies on behalf of any *insurer*." *Asousa P'ship v. Mfrs. Alliance Ins. Co. (In re Asousa P'Ship.)*, No. 05–5719, 2006 WL 2828890, *4, n. 4, 2006 U.S. Dist. LEXIS 71391, at *14 n. 4 (E.D.Pa. Sept. 29, 2006) (emphasis added); *Antimary v. Workmen's Comp. Appeal Bd.*, 655 A.2d 659, 662 n. 6 (Pa. Cmwlth.1995). An insurance broker is "a person who acts on behalf of another person to obtain insurance." *Id. See* 31 Pa. Code § 37.1 (defining the terms "agent" and "broker" in the Pennsylvania Administrative Code). *See also Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mut. Ins. Co.*, 641 F.Supp. 297, 303 (E.D.Pa.1986).

■ 25. In securing an insurance policy, the general rule in Pennsylvania is that the insurance broker is an agent of the *insured:*

> Where a person desiring to have his property insured applies not to any particular company or its known agent, but to an insurance broker, permitting him to choose which company shall become the insurer, a long line of decisions has declared the broker to be the agent of the insured; not of the insurer.

*Taylor v. Crowe*, 444 Pa. 471, 282 A.2d 682, 683 (1971) (quotations and citation omitted). *See also Comcast Spectacor L.P. v. Chubb & Son, Inc.*, No. 05–1507, 2006 WL 2302686, **9–12, 2006 U.S. Dist. LEXIS 55226, at *35–41 (E.D.Pa. Aug. 8, 2006).

26. In *Crowe*, the insured argued that the broker he used to acquire the insur-

---

**24.** "It is well settled in the law of this jurisdiction that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and therefore, knowledge of the agent is knowledge of the principal." *Workmen's Compensation Appeal Bd. v. The Evening Bulletin*, 498 Pa. 219, 224, 445 A.2d 1190, 1192 (1982) (citations omitted); *see Indovina v. Metro. Life Ins. Co.*, 334 Pa. 167, 170, 5 A.2d 556, 558 (1939) (" 'The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest.' " (quoting *Mutual Life Ins. Co. v. Hilton–Green*, 241 U.S. 613, 622, 36 S.Ct. 676, 60 L.Ed. 1202 (1916))).

ance policy at issue was an agent of the insurers because the broker had a "written agency 'producer' contract" with two of the insurers. The Pennsylvania Supreme Court, however, did not find the insured's argument persuasive. Instead, it found that the broker was an agent of the insured due to the insured's testimony that the broker was in "complete charge of our insurance." The insured trusted the broker "to go out and buy ... the best insurance" he could and he was not concerned about "where he was getting it [insurance] or who he was getting it from." *Crowe*, 282 A.2d at 683.

27. *Crowe* also found that the case for a lack of an agency relationship between a broker and an insurer was strong where: (a) the broker approached the insurer through another broker to obtain the policy; (b) the broker did not know with which company the second broker would place the coverage; and (c) the broker did not have contact with the insurer himself. *Id.* at 684.

28. The Pennsylvania Administrative Code provides that "[w]hen a broker is authorized by the client to secure insurance, the broker shall be considered the legal agent of the client." 31 Pa. A.C. § 37.45.

29. Asten hired Babb to obtain the best available insurance coverage for it. Asten placed minimum restrictions on Babb's insurance acquisition efforts and trusted Babb to represent Asten's best interest in Babb's dealings with insurers.

30. Insurance broker Babb and its employees, in particular Gloria Forbes, were Asten's agent during the negotiations for and the placement of the Subject Policies. Gloria Forbes's knowledge and understanding of the Subject Policies, including the Asbestosis Exclusion, are imputed to Asten.

31. In some instances a broker can function as a middle man and "be an agent for the insured in some respects and an agent for the insurer in other respects." *Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mut. Ins. Co.*, 641 F.Supp. 297, 303 (E.D.Pa.1986) (citing 3 Couch on Insurance 2d § 25:93–94 (1984)).

32. The Pennsylvania Supreme Court has held that in order for an insurance broker to be an agent of the insurer in negotiations, "there must be some evidence of an authorization, or some fact from which a fair inference of an authorization by the [insurance] company might be deduced to make an insurance broker the agent of the company." *Crowe*, 282 A.2d at 684 (quoting Couch on Insurance 2d § 25:95).

33. While Babb employee Mary Sassaman signed the American policies and several binders on behalf of the defendant insurance companies, Asten failed to demonstrate that Babb represented either American's or Columbia's interest in the negotiations or securing of the Subject Policies. In short, as it relates to the issues of this case, Babb was not an "agent" of either defendant.

34. DVUA was an agent of Columbia during the acquisition process for the Subject Columbia Policies.

**D. INTERPRETATION OF THE ASBESTOSIS EXCLUSION**

*1. General Principles of Insurance Contract Interpretation*

35. The task of interpreting an insurance contract is generally performed by a court rather than by a jury. *See Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999).

36. In order for an insured to recover under a policy the insured must show a claim within the coverage provided by the policy. If an insurance company objects to coverage and raises a defense

based on an exclusion in a policy, the burden is on the defendant to establish that affirmative defense. *See Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999); *Erie Ins. Exchange v. Transamerica Ins. Co.,* 516 Pa. 574, 533 A.2d 1363, 1366 (1987). *See also Canal Ins. Co. v. Underwriters at Lloyd's London,* 435 F.3d 431, 435 (3d Cir.2006).

37. Asten seeks coverage from Columbia and American under the Subject Policies for all claims against it that allege asbestos-related injury other than asbestosis. Since Columbia and American have denied coverage on the basis of the Asbestosis Exclusion, they have asserted an affirmative defense and bear the burden of proving the applicability of the policy exclusion to the underlying claims.

 38. "[A] writing must be interpreted as a whole, giving effect to all its provisions." *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736, 739 (1978) (citing *Shehadi v. Northeastern Nat. Bk. of Pa.,* 474 Pa. 232, 378 A.2d 304 (1977)). "No provision within a contract is to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given to it." *Sparler v. Fireman's Ins. Co. of Newark, N.J.,* 360 Pa.Super. 597, 521 A.2d 433, 438 n. 1 (1987).

*2. Is the Asbestosis Exclusion* [25] *Unambiguous?*

*a. Determining the Intent of the Parties from the Language of the Exclusion*

 39. In interpreting the terms of an insurance contract, like any other contract, a court must determine the intent of the parties at the time of contracting from the language of the policy. *See Mohn v. American Casualty Co.,* 458 Pa. 576, 326 A.2d 346, 351 (1974); *Kennedy v. Erkman,* 389 Pa. 651, 133 A.2d 550, 552 (1957).

 40. "If the words of the policy are clear and *unambiguous,* the court must give the words their plain and ordinary meaning." *Pacific Indem. Co. v. Linn,* 766 F.2d 754, 760–61 (3d Cir.1985) (emphasis added). In other words, "[w]hen the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.,* 588 Pa. 470, 905 A.2d 462, 468 (2006) (citing *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 390 (1986)).

 41. "When a term in the policy is ambiguous, however, and the intention of the parties cannot be discerned from the face of the policy, the court, in its attempts to arrive at a reasonable construction of the policy that is in accord with the parties' apparent intention, may look to extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract." *Pacific Indem. Co. v. Linn,* 766 F.2d 754, 761 (3d Cir.1985) (citing *Celley v. Mutual Benefit Health & Accident Association,* 229 Pa.Super. 475, 324 A.2d 430, 434 (1974)).

 42. "Where a provision of a policy is *ambiguous,* the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Madison Constr. Co. v. Har-*

---

**25.** The Asbestosis Exclusion states:

It is agreed that this policy does not apply to any claim alleging an exposure to or the contracting of asbestosis or any liability resulting therefrom.

It is further agreed that this policy does not apply to any claim arising out of the Insured's membership in the Asbestos Textile Institute.

*leysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999) (emphasis added). *See also Mohn*, 326 A.2d at 351; *Miller v. Prudential Ins. Co.*, 239 Pa.Super. 467, 362 A.2d 1017, 1020 (1976) ("[A]n insurance policy is to be construed most strongly against the insurer and liberally in favor of the insured so as to effect the dominant purpose of indemnity or payment to the insured, but this is where the terms of the policy are ambiguous or uncertain and the intention of the parties is therefore unclear."). When any doubts exist, coverage should be found for the insured. Likewise, in interpreting a policy provision, a court should err in favor of the insured. *See Techalloy Co. v. Reliance Ins. Co.*, 338 Pa.Super. 1, 487 A.2d 820, 823–24 (1984).

■ 43. "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Constr. Co.*, 735 A.2d at 106 (internal quotations and citations omitted). *See also Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 163 (3d Cir.2002) ("A contract is ambiguous if it: (1) is reasonably susceptible to different constructions, (2) is obscure in meaning through indefiniteness of expression, or (3) has a double meaning." (quotation and citation omitted)).

■ 44. The court may not torture the language of a policy to create ambiguities where none exist. *See Houghton v. American Guaranty Life Insurance Co.*, 692 F.2d 289, 291 (3d Cir.1982).

45. Both Asten and the Insurance Companies argue that the Asbestosis Exclusion is unambiguous, but their interpretations of the exclusion's language are at odds.[26]

46. The policy language in question is: "It is agreed that this policy does not apply to any claim alleging an exposure to or the contracting of asbestosis or any liability resulting therefrom."

47. As medically defined, asbestosis is a specific type of respiratory disease caused by inhaling asbestos fibers. It is distinguishable from other types of asbestos-related diseases, such as lung cancer and mesothelioma. A person can only contract asbestosis by being exposed to asbestos.[27] No injury can occur by being exposed to asbestosis (in another person).

48. Therefore, at first glance the term "contracting of asbestosis" in the exclusion

---

26. Asten argues that the plain and ordinary meaning of the phrase "any claim alleging an exposure to or the contracting of asbestosis" in the exclusion refers to the specific disease of asbestosis, which is interstitial fibrosis or a scarring of the tissue of the lungs caused by the inhalation of asbestos fibers that results in functional impairment. Therefore, the exclusionary language unambiguously operates to exclude coverage only if the claims asserted against Asten allege injury due to the specific disease of asbestosis.

Columbia contends that the exclusion is unambiguous and the only reasonable construction is one in which the exclusion bars all claims arising from exposure to asbestos. Columbia relies on the following to support its interpretation: (1) the bargaining history between the parties; (2) Asten's post-agreement conduct; (3) the trade usage of the term "asbestosis" to mean all asbestos-related diseases; and (4) the language of the exclusion itself.

American suggests that the exclusion is unambiguous and the exclusion applies to all asbestos-related claims. American points out two possible ways to interpret the plain meaning of the exclusion and they both yield the same result—an all-encompassing exclusion. American also claims that the interpretation advanced by Asten is unreasonable because of the phrase "exposure to . . . asbestosis."

27. Asbestos is a mineral that separates into fibers.

appears to apply only to claims that allege Asten's products caused a specific asbestos-related disease injury.[28]

49. On the other hand, the phrase "exposure to . . . asbestosis" appears to make little sense due to a person's inability to be injured from an exposure to a person with asbestosis. It is a nonsensical phrase. If one looks at the "exposure to . . . asbestosis" language in the context of Asten and its products, the words can be given a plausible meaning. The language can only be interpreted to exclude claims that allege the plaintiff's exposure to Asten's asbestos-containing products. A person must be exposed to asbestos to create the risk of contracting asbestosis. Given the exclusion's language barring claims that allege the contracting of the disease itself, the "exposure to" language can only refer to the cause of the disease (the mineral asbestos) in order to give meaning to each word of the exclusion. However, this initial construction of the exclusion does not end my analysis.

50. Regardless of whether the Asbestosis Exclusion is unambiguous or ambiguous, under Pennsylvania law, trade custom and usage and the course of performance of the parties under the Subject Policies may be examined to ascertain the parties' intent as found in the policies' language. " '[T]he manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of perform-

ance, course of dealing, or usage of trade.' " *Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 566 Pa. 494, 781 A.2d 1189, 1193 (2001) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202(5)); *see also Spatz v. Nascone*, 283 Pa.Super. 517, 424 A.2d 929, 937 (1981) (noting that Pennsylvania courts have often relied on the Restatement of (Second) Contracts for guidance in the interpretation of contracts).

51. If usage and course of performance shed no light on the parties' intention and I were to find that the absurdity of the phrase "exposure to asbestosis" rendered the Asbestosis Exclusion ambiguous, I do not automatically interpret the exclusion in favor of the insured. Pennsylvania law allows a court to examine the circumstances surrounding the insurance policies' placement to arrive at a "reasonable construction of the policy that is in accord with the parties' apparent intention." *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 761 (3d Cir.1985).

52. Each of these pieces of evidence in this case (trade custom and usage, course of performance, and the surrounding circumstances in making the policies) leads to the same conclusion— the parties intended the Asbestosis Exclusion to exclude all asbestos-related claims.

#### b. Trade Custom and Parties' Usage of the Term "Asbestosis"

53. Custom in the industry or usage in the trade is always relevant in

---

**28.** This court's interpretation of the word asbestosis, however, is not limited by the term's strict medical definition. "The courts of this state have been careful not to interpret technical words in a contract without an examination of the context in which they were used." *Spatz v. Nascone*, 283 Pa.Super. 517, 424 A.2d 929, 939 (Pa.Super.1981). In the interpretation of the Asbestosis Exclusion, I do not look at the words of the exclusion in isolation. *See Madison Construction Co. v. The Harleysville Mutual Ins. Co.*, 557 Pa. 595, 735 A.2d 100

(1999) (noting that whether ambiguity exists in contractual language is "not a question to be resolved in a vacuum" but must be answered based on a "particular set of facts"). *See generally Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918) (A "word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.").

construing contracts and it does not depend on any ambiguity in the language of the contract. "If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way.... Where terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense, evidence to that effect is admissible for the purpose of applying the instrument to its proper subject matter.... In the absence of an express provision to the contrary, custom or usage, once established, is considered a part of a contract and binding on the parties though not mentioned therein, the presumption being that they knew of and contracted with reference to it." *Sunbeam Corp.*, 781 A.2d at 1193.[29]

54. The defendants adequately established that the term asbestosis was used with regularity and uniformity in the insurance industry in the early 1980s as a catchall for *all* asbestos-related diseases. Asten's evidence at trial showed the insurance industry also used the term asbestosis in policy exclusions to refer to the singular disease, but it was on occasions when other asbestos-related diseases were listed.

55. The credible expert testimony of Mr. Jordan and Mr. Gagan, along with the documentary evidence that showed other insurers responding to Asten's tender of claims during the early 1980s, established that in the early 1980s when the insurance industry was discussing the injuries that resulted from the exposure to asbestos, and it used the term asbestosis by itself, the asbestosis reference encompassed all asbestos-related diseases.[30]

56. Forbes, the agent of Asten and a member of the insurance industry, testified that in the early 1980s when she used the word asbestosis she was referring to all diseases that could be caused by exposure to asbestos.[31] Plaintiff's knowledge of the usage of the term "asbestosis" to mean all asbestos-related diseases allows the usage's incorporation into the policies. *See B.P. Apparel, Inc. v. Hunt*, No. 97–4095, 1999 WL 551892, *5, 1999 U.S. Dist. LEXIS 9632, at *15 (E.D. Pa. June 16, 1999) ("In attempting to base a contract term or provision upon an industry custom or practice, the [moving party] has the burden of providing evidence that clearly establishes either that the other party has actual knowledge of the custom or that the custom or practice is so notorious, well established, and reasonable that the other party

**29.** The Restatement (Second) of Contracts provides additional guidance as to what must be shown in order to establish a usage of trade: "A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement." RESTATEMENT (SECOND) OF CONTRACTS § 222.

**30.** This conclusion is supported by other court decisions that considered the meaning of the word asbestosis in 1980s insurance policy, *see* AMER121 (*California Coordinated Proceedings*, Judicial Proceeding No. 1072, p. 16–17 (Judge Ira Brown Statement of Reasons for Decision Re: Phase II) (Super.Ct.Cal. Jan. 14, 1986)) (holding that the parties's use

of the term asbestosis to refer to all asbestos-related diseases at the time "accorded with the general usage of the word among participants in the insurance business in London and in North America" in the late 1970s and early 1980s), and by the near impossibility to write an effective partial exclusion for a singular asbestos-related disease. *See supra* Part II.G; *infra* Part III.D.2.d.

**31.** Her testimony was supported by several of the documents prepared by Forbes during the relevant time period. Forbes, on several occasions, referenced the Asbestosis Exclusion as excluding coverage for "asbestos products," which is more in line with an exclusion that bars all asbestos-related diseases as opposed to a specific asbestos disease.

should have such knowledge." (citing *Jacobson v. Leonard,* 406 F.Supp. 515, 520–521 (E.D.Pa.1976); *Leslie v. Pennco,* 323 Pa.Super. 23, 470 A.2d 110, 113–14 (1983))); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 222 ("Unless otherwise agreed, a usage of trade in the vocation or trade in which the parties are engaged ... gives meaning to or supplements or qualifies their agreement.").

57. Trade usage aside, the parties involved in the negotiation and placement of the 1981 Columbia Policy understood the term "asbestosis" to mean all asbestos-related diseases. *See supra* Part II.E.3.a (finding that Columbia's Sayles and Asten's agent Forbes understood asbestosis to mean all asbestos-related diseases). That common usage of the term asbestosis among the parties to the contract provides meaning to the word in the policy. *See Spatz v. Nascone,* 283 Pa.Super. 517, 424 A.2d 929, 937–38 (1981) ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." (quoting tentative draft No. 5 of the RESTATEMENT (SECOND) OF CONTRACTS § 227)); RESTATEMENT (SECOND) OF CONTRACTS § 220 cmt. d *quoted in Sunbeam Corp.,* 781 A.2d at 1193 ("[U]sage relevant to interpretation is treated as part of the context of an agreement in determining whether there is ambiguity or contradiction as well as in resolving ambiguity or contradiction. There is no requirement that an ambiguity be shown before usage can be shown, and no prohibition against showing that language or conduct have a different meaning in the light of usage from the meaning they might have apart from the usage. The normal effect of a usage on a written contract is to vary its meaning from the meaning it would otherwise have."). *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 220 cmt. b ("An agreement is interpreted in accordance with a relevant usage if each party knew

or had reason to know of the usage .... Hence a party who asserts a meaning based on usage must show ... that the other party knew of the usage.").

58. Therefore, in the early 1980s, when insurance personnel used the term "asbestosis" in an exclusion (on its own and not in conjunction with any other disease) to refer to asbestos-caused disease, they meant all asbestos-related diseases. When the parties to the Subject Columbia Policies included the term "asbestosis" in the Asbestosis Exclusion they understood it to mean all asbestos-related diseases and they intended the phrase "the contracting of asbestosis" to exclude any claim alleging any asbestos-related disease.

### c. Course of Performance

59. The course of performance of the parties, *i.e.,* the parties' post-agreement conduct, is *always* relevant in interpreting a contract. *See Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736, 741 (1978). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 202 cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.... [T]he conduct of a party may be evidence against him that he had knowledge or reason to know of the other party's meaning."). A court should consider the course of performance no matter whether the language of the contract is ambiguous or unambiguous. *See Atlantic Richfield,* 390 A.2d at 741 n. 6. *See also Pennsylvania Engineering Corp. v. McGraw–Edison Co.,* 500 Pa. 605, 459 A.2d 329, 332 (1983); *Sun Company v. Pennsylvania Turnpike Commission,* 708 A.2d 875 (Pa.Cmwlth.1998) ("As the Pennsylvania Supreme Court held, the course of conduct of a party is always relevant in interpreting a contract and may be the

strongest indication of the intention of the parties to the contract.").

60. In this case, Asten's course of performance over the twenty plus years after the execution of the Subject Policies is the most compelling evidence of the intention of the parties. It clearly demonstrates that Asten understood and intended the Asbestosis Exclusion to bar all claims alleging any asbestos-related disease or the exposure to Asten's asbestos-containing products.

61. In the twenty years that it took Asten to put Columbia on notice of its underlying asbestos-related claims, the following occurred:

 a. Asten put all of its pre–1981 general liability carriers on notice of all of its asbestos-related claims. Asten also put its excess carriers on notice of the underlying claims (even during the early and mid–1980s when Asten's exposure in these suits was purportedly minimal). Asten did not refrain from its practice of tendering all claims (and copies of the underlying complaints) to its insurers unless affirmatively told by a particular insurer to stop. In other words, Asten followed the universal practice in environmental liability cases to notify all potential carriers of underlying claims because of the uncertainty as to which policy may provide coverage. *See* Tr. 9/22/06 Jordan at 205:2. The absence of Columbia from Asten's notice policy leads to the conclusion that Asten understood and intended the Asbestosis Exclusion to exclude all asbestos-related claims.

 b. In 1984, Asten hired insurance archaeologists to investigate and locate all of its available insurance coverage, including missing policies from Zurich and PMA. The registers that they created identified the Subject Columbia Policies and quoted their Asbestosis Exclusion, proving Asten's knowledge of the Subject Policies and the language of the exclusion.

 c. Asten filed a coverage action against all of its pre–1981 primary carriers [32] and amended the complaint once to add Argonaut, but never bothered to amend it a second time to add Columbia even though the litigation continued for 17 years.

 d. Until Asten settled its 1980 Coverage Action in 1997, Asten was paying for its own defense and indemnity costs in many of the underlying asbestos suits. And although as part of the settlement of the 1980 Coverage Action Asten was reimbursed for its substantial costs, under Asten's interpretation of the Asbestosis Exclusion, this was money it did not need to spend. Asten could have tendered many of the claims to Columbia to defend and/or indemnify, but it did not.

 e. Asten was being sued by plaintiffs who alleged asbestos-related diseases other than the singular disease of asbestosis such that, assuming Asten's interpretation of the exclusion was correct, Columbia would have had to provide coverage for the claims. Furthermore, under Asten's interpretation, Pennsylvania law would have required Columbia to cover the defense and possibly the indemnity of any of the commonly-pled underlying asbestos suits that alleged multiple diseases, which included but were not limited to asbes-

---

**32.** Asten included Zurich, which purportedly issued policies from 1934–1957, as a defendant in the 1980 Coverage Action even though Asten could not locate Zurich's policy documents.

tosis. *See infra* Part III.D.2.d (discussing an insurer's duty to defend under Pennsylvania law and it being triggered whenever the complaint filed by the injured party may potentially come within the policy's coverage). Yet, Asten failed to tender a single non-asbestotic claim to Columbia for twenty years and failed to invoke Columbia's duty to defend for the asbestos claims that alleged multiple asbestos-related injuries. These failures, when viewed in the context of the terms of the Subject Policies, support the conclusion that Asten intended the Asbestosis Exclusion to exclude any claim alleging any asbestos-related disease or the exposure to Asten's asbestos-containing products.

f. In 1999, Asten purchased a $50,000,000 aggregate excess of loss insurance policy from Swiss Re for $31,000,000 to be paid in ten annual installments of between $1,000,000 and $5,000,000 per year, in lieu of attempting to collect any money under the Subject Columbia Policies for another two years. At the same time, Asten expressed its concern that the Subject Policies' exclusions may bar coverage for all asbestos-related diseases, without having even discussed the matter with the defendant insurers.

62. Asten's rationale for waiting so long to notify Columbia of the thousands of asbestos-related actions that had been brought against it for two decades is that under the Pennsylvania Supreme Court's *J.H. France* decision an insured was not required to tender claims on all policies triggered at the same time, *i.e.*, it could wait and exhaust one policy before putting a second policy on notice. However, Asten's argument is unavailing. The initial Columbia policy was acquired by Asten in 1981 and *J.H. France* was not decided until 1993. In the intervening twelve years, Asten would have had no reason (legal or otherwise) to believe that the company could afford the luxury of waiting to tender a claim and/or to put Columbia on notice.[33] In any event, the *J.H. France* opinion did not hold that an insurer can wait to *notify* a carrier of possible claims— only that it can do so with respect to *tendering* a formal claim. The Subject Columbia Policies require timely notice of claims regardless of tender of coverage.[34]

63. Asten's post-contractual method of reporting and recording its available insurance coverage is further evidence of its understanding and intent that the Asbestosis Exclusion barred all asbestos-related

**33.** During these twelve years, the state of the law regarding the trigger of coverage for asbestos-related claims was uncertain. A court could have applied one of three different trigger theories (exposure, continuous, or manifestation) and, depending upon which theory it applied, Asten's failure to tender claims to Columbia could have been costly. For example, under the "manifestation" theory, only claims that manifest, *i.e.*, where injuries are perceived or diagnosed, during an insurance policy period are covered under a policy. Therefore, under the facts here, no claim that manifested during the period April 1, 1981 to October 1, 1983 would have been covered by any policy other than the Subject Policies. Despite this uncertainty in the law and the Subject Policies possibly being the only policies to cover certain claims, Asten did not pursue coverage under the policies until 20 years later. Such a course of performance by Asten indicates it believed the Subject Policies excluded all asbestos-related claims. *See supra* Part II.D.2, II.F.c.iii (discussing the Pennsylvania adoption of the multiple-trigger theory in *J.H. France* in 1993).

**34.** "If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." CCC229; CCC277.

claims. Specifically, in reporting available or remaining insurance coverage to its own board, Asten failed to identify the amounts of coverage associated with the Subject Policies. By the same token, audited financial statements also failed to mention the Subject Policies and their respective policy limits as late as December 31, 2001, even though special reference was made to the 1999 Swiss Re Policy's terms and limits.

64. In 1983 when Columbia was seeking to have Asten renew the primary policy (with the Asbestosis Exclusion) for a second time, Asten ultimately decided against renewal with Columbia and, instead, purchased a policy that contained the following asbestos exclusion: "It is hereby understood and agreed that this policy shall not apply to any and all liability for past, present or future claims arising out of the manufacture, distribution, installation or handling of asbestos or products containing asbestos materials." *See* AMER69.

65. If Asten believed that the Subject Columbia Policies provided coverage for all but asbestotic claims, there is no logical reason for it to have chosen a policy that excluded all asbestos-related claims when the option of partial coverage was still being offered by Columbia.

66. Finally, when responding to interrogatories served on Asten in the underlying asbestos cases, as late as 1998, Mr. Young never included the Subject Columbia Policies in response to questions requesting information concerning available coverage.

67. In sum, Asten's course of performance in (a) drawing a bright line at pre-April 1981 insurance coverage regarding the investigating, notifying, and tendering of asbestos-related claims; (b) instituting and pursuing an asbestos coverage litigation over the course of 17 years, while absorbing the costs of defending the underlying asbestos claims, without adding Columbia; and (c) failing to notify or tender a single non-asbestotic claim to Columbia for twenty years, supports the conclusion that Asten understood and intended the Asbestosis Exclusion to exclude all asbestos-related claims—those that alleged the contracting of any asbestos-related disease and those that alleged an exposure to Asten's asbestos-containing products.

d. *The Circumstances Surrounding the Entering into the Subject Policies*

68. In order to determine the intent of the parties in drafting the Asbestosis Exclusion, the circumstances surrounding the making of the insurance policy are relevant. The court must "consider the circumstances, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract." *United Refining Co. v. Jenkins*, 410 Pa. 126, 189 A.2d 574, 580 (1963).[35]

**35.** As the Pennsylvania Supreme Court stated in its interpretation of a contract:

In the construction of any contract, certain principles must guide us: (a) if there is any doubt as to the meaning of a term of a contract, such term should receive a reasonable construction and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the [contract] was made; (b) in construing a contract we seek to ascertain what the parties intended and, in so doing, we consider the circumstances, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract; (c) However broad may be the apparent terms of the agreement, it extends only to those things concerning which the parties intended to contract, and the subject-matter of their negotiations may affect the meaning of the words they employ, especially if, in connection with that subject-matter, the conventional interpretation would give an unreasonable or absurd result.

*See also Northbrook Ins. Co. v. Kuljian,* 690 F.2d 368, 372 n. 5 (3d Cir.1982) (noting that Pennsylvania cases "permit examination of external signs and objective indicia to aid in a rational interpretation of the parties' intent"); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1010 (3d Cir.1980) ("External indicia of the parties' intent other than written words are useful, and probably indispensable, in interpreting contract terms. If each judge simply applied his own linguistic background and experience to the words of a contract, contracting parties would live in a most uncertain environment.").

69. In the time leading up to the acquisition of the 1981 Columbia Primary Policy, the danger of asbestos was common knowledge.[36]

70. In early 1981, Asten had serious concerns and doubts about its ability to obtain coverage for asbestos-related claims because: (a) it had asbestos-related lawsuits pending against it (even if they only were based on its membership in the ATI); (b) Asten's prior primary insurer did not renew its coverage partly because of the asbestos claims against it; (c) Asten's principals involved in the acquisition of the Subject Policies were fully aware that As-ten's Canadian affiliate could only obtain general liability insurance coverage by agreeing to self-insure asbestos products claims; and (d) Asten had previously manufactured products made with asbestos.

71. In early 1981, Columbia was aware of: (a) the existing lawsuits against Asten; (b) Asten's use of asbestos in the manufacturing of its dryer felts up until 1979; and (c) the great risk of indemnifying any type of asbestos-related claim.

72. In the early 1980s, in the hundreds of asbestos-related bodily injury lawsuits in which Asten was named a defendant, the plaintiffs would allege that (a) they contracted only asbestosis; or (b) they contracted asbestosis along with a laundry-list of other asbestos-related diseases; or (c) they contracted non-asbestotic diseases. In other words, there was a lot of confusion and uncertainty as to the different diseases caused by asbestos and when a plaintiff would allege a certain type of asbestos-related disease.

73. The subject matter of the exclusion in question is asbestosis and in the early 1980s, the term "asbestosis" was used to mean two different things. First, the term was used to mean the specific asbestos-related disease discussed above and found in a medical dictionary. Second, it was

*United Refining Co.,* 189 A.2d at 580 (quotations and citations omitted). *See also Pacific Indem. Co. v. Linn,* 766 F.2d 754, 760–61 (3d Cir.1985); RESTATEMENT (SECOND) OF CONTRACTS § 212 cmt. b ("It is sometimes said that extrinsic evidence cannot change the plain meaning of writing, but meaning can almost never be plain except in a context.... Any determination of meaning or ambiguity should only be made in light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties."); *Spatz v. Nascone,* 283 Pa.Super. 517, 424 A.2d 929, 937 (1981) (noting that Pennsylvania courts have often relied on the Restatement of (Second) Contracts for guidance in the interpretation of contracts).

36. The unpalatable facts are that in the twenties and thirties the hazards of working with asbestos were recognized; that the United States Public Health Service documented the significant risk in asbestos textile factories in 1938; that the Fleischer–Drinker report was published in 1945; that in 1961 Dr. Irving Silikoff [sic] and his colleagues confirmed the deadly relationship between insulation work and asbestosis.

*Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1106 (5th Cir.1974). *See generally* P78 (IRVING J. SELIKOFF & DOUGLAS H.K. LEE, ASBESTOS AND DISEASE (Academic Press 1978)).

used as a generic term, *i.e.*, an all encompassing term that includes all asbestos-related diseases. The dual meaning of the term asbestosis was also found in the insurance industry. *See supra* Part III. B.2.b.

██ 74. In the correspondence between the parties on April 2, 1981, the exclusion was classified as excluding all claims arising from "asbestos or asbestosis."[37] This communication shows that the parties contemplated a type of "either-or" exclusion for asbestos-related claims and that coverage could either be written to exclude the hazard, itself, (*i.e.*, asbestos) or the result of the hazard (the generic reference to asbestosis). Either approach would serve to exclude all claims.[38]

75. Given the nature of the underlying complaints in the early 1980s, where plaintiffs often would allege an asbestosis injury along with other asbestos-related injuries, the Asbestosis Exclusion that only applied to the specific disease asbestosis would offer an insurance company very little protection. That is because under Pennsylvania law, an insurer excluding just asbestosis claims would still be required to defend any asbestos lawsuit alleging asbestosis and any other of the diseases that result from exposure to asbestos.[39] The insurer's duty to defend would only be relieved if the claimant's disease was narrowed down to asbestosis only. And if the diagnosis could never be narrowed down to exclude all disease but asbestosis, the insurer would have to indemnify as well.

76. Therefore, the environment surrounding the acquisition of the 1981 Columbia Primary Policy was one in which an insurance company would have been foolish not to exclude all asbestos-related claims against an insured that manufactured asbestos. An exclusion that applied only to a single asbestos-related disease would have had little effect given the nature of the underlying complaints; an insurer would still incur the costs of processing, defending, and potentially indemnifying "asbestosis" claims. And both Asten and Columbia were well aware of this. As it learned in Canada, Asten knew it would not be able to acquire coverage for asbestos-related claims. Asten manufactured asbestos and its exposure to asbestos liability had begun prior to 1981. Columbia knew Asten's history and it expressed to Asten's

**37.** The parties spent a substantial amount of time presenting evidence of the correspondence between Columbia and DVUA and between Babb and Asten in the time leading up to the acquisition of the 1981 Columbia Primary Policy. However, Pennsylvania contract law does not consider "one party's subjective intent or understanding of a contractual obligation. Rather, instead, [Pennsylvania] law requires a 'meeting of the minds' of sorts." *State Auto. Ins. Ass'n v. Anderson*, 365 Pa.Super. 85, 528 A.2d 1374, 1376 (1987). The April 2, 1981 communication between DVUA and Babb, agents for Columbia and Asten respectively, reflects a meeting of the minds.

**38.** Comment b to Restatement (Second) of Contracts § 214 is apropos:

> The expressions and general tenor of speech used in negotiations are admissible to show the conditions existing when the writing was made, the application of the words, and the meaning or meanings of the parties. Even though words seem on their face to have only a single possible meaning, other meanings often appear when the circumstances are disclosed.

**39.** Under Pennsylvania law, an insurance company is obligated to defend an insured whenever the complaint filed by the injured party may potentially come within the policy's coverage. The obligation to defend is determined solely by the allegations of the complaint in the action. The duty to defend remains with the insurer until the insurer can confine the claim to a recovery that is not within the scope of the policy.

*Pacific Indem. Co. v. Linn*, 766 F.2d 754, 760 (3d Cir.1985) (internal citations omitted).

agent its desire to exclude all asbestos-related claims.

77. Under the circumstances of the 1981 Columbia Primary Policy, and taking into account the facts of this case, the parties, and the subject matter of the contract, Asten and Columbia could only have intended the Asbestosis Exclusion to have one meaning. As used in the Asbestosis Exclusion the term asbestosis means "all asbestos-related diseases" and the phrase "exposure to ... asbestosis" means exposure to Asten's asbestos-containing products.

### e. Conclusion

78. Accordingly, interpreting the words of the Asbestosis Exclusion, in light of the trade usage of the term asbestosis in the early 1980s, the parties' usage of the term asbestosis, and the course of performance of Asten in the twenty plus years after entering into the Subject Policies, I conclude that the term "asbestosis" in the Asbestosis Exclusion means all asbestos-related diseases and not merely the disease known specifically (and medically) as asbestosis and the phrase "exposure to ... asbestosis" means exposure to Asten's asbestos-containing products.[40] The circumstances surrounding the exclusion's drafting also supports this conclusion.

79. The Asbestosis Exclusion bars coverage for all underlying claims that allege the contracting of any asbestos-related disease or the plaintiff's exposure to Asten's asbestos-made products and "any liability resulting therefrom." The term "asbestosis," as used in the exclusion, is unambiguous in that it lends itself to only one interpretation. This interpretation is informed by the usage of trade, usage of the parties, and the course of performance of the parties. It is this court's conclusion that the Asbestosis Exclusion was intended by the parties to exclude from coverage all claims deriving from the exposure to Asten's asbestos-containing products.

80. For the same reasons, this conclusion applies to the Asbestosis Exclusion in each of the Subject Columbia Policies. No evidence was presented that would indicate the parties intended this unambiguous exclusion to have a different meaning in the different policies.

81. As for the Subject American Policies, the Following Form endorsement in each of the policies was intended to conform American's coverage to Columbia's. The Following Form endorsements were included for the purpose of securing for American the same benefits of the "Asbestosis Exclusion" in the Columbia policies.[41] Accordingly, the intent of the parties with

---

**40.** An additional argument raised by Asten, to support its position that the term asbestosis must refer only to the singular disease, is that to construct the exclusion to mean all asbestos-related diseases would make the ATI exclusion surplusage. *See Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736, 739 (1978) ("[A] writing must be interpreted as a whole, giving effect to all its provisions."). This argument, however, fails. The ATI exclusion covered a specific genre of claims that had been filed against Asten at the time of the Subject Policies, namely conspiracy claims involving Asten's membership in the ATI. The Asbestosis Exclusion excluded a different class of asbestos-related claims, namely product liability claims based on Asten's manufacturing of asbestos products.

**41.** The Following Form language states that the American policies provide coverage "to occurrences arising out of the products hazard" only to the extent coverage is available under the primary Columbia policies. Under the definitions of the 1981 American Umbrella Policy, the American policies only provide coverage to the extent the Columbia policies cover any "accident including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expect nor intended from the standpoint of the insured," "arising out of the named insured's products." Since the Subject Columbia policies exclude any claim that alleges an asbestos-related injury that arises from an exposure to Asten's asbestos-containing products, the Subject American Policies exclude the claims as well. *See also See* Tr.

respect to the Subject American Policies was to exclude all claims deriving from the exposure to Asten's asbestos-containing products.

### E. DEFENDANTS' AFFIRMATIVE DEFENSES

#### 1. Late Notice and Prejudice

■ 82. Under Pennsylvania law, "[w]here an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position." *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193, 198 (1977).

83. Given the conclusion that the Asbestosis Exclusion excludes any claim that alleges an asbestos-related injury, the late notice affirmative defense is moot. *See generally Trustees of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 898 (3d Cir.1987) ("[C]ourts have required a show-

9/26/06 Zack at 148:6–149:14; 150:22–152:2 (noting that the practice in the insurance industry at the time was to consider all asbestos-related claims as "products" claims).

**42.** And I will not make a holding on whether the late notice affirmative defense would succeed if the Asbestosis Exclusion was interpreted to apply only to the specific disease of asbestosis. Such a conclusion would be mere dictum and it may require me to unnecessarily examine an uncertain area of Pennsylvania law, given the defendants' argument that the prejudicial late notice defense applies with equal force to an insurer's ability to defend either a coverage action against the insured or an underlying action against a third-party. *See Brakeman*, 472 Pa. 66, 371 A.2d 193(holding the insurer's late notice affirmative defense applies to the defense of an underlying claim). Neither defendant cites to a case that applies Pennsylvania law and holds that the *Brakeman* rule applies to an insurance coverage action. *But see Metal Bank of America, Inc. v. Ins. Co. of North America*, 360 Pa.Super. 350, 520 A.2d 493, 499 n. 4 (1987) (quoting with approval a finding by the lower court that an insurer was prejudiced, not only by

ing not only of the loss of substantial defense opportunities [to show prejudice] but also of a 'likelihood of success' in defending liability or damages if those opportunities had been available."). Since the underlying asbestos claims fall within this exclusion, and the defendants' coverage does not extend to these claims, Asten had no obligation to provide notice of the claims to American or Columbia.[42]

#### 2. Breach of the Duty of Good Faith and Fair Dealing

84. Columbia argues that Asten's coverage suit is barred due to Asten's breach of the implied duty of good faith and fair dealing owed to an insurer. Under Columbia's theory, an insured's failure to provide a carrier with reasonable notice of a claim is an implied breach of the insurance contract.

■ 85. Each party to an insurance contract, the insurer and the insured, has a duty to act in good faith.[43]

"depriving it of the opportunity to investigate the underlying action," but also in its ability to "defend the present claim [against insurers] being brought for indemnification and expenses"); *West Bay Exploration Co. v. AIG Specialty Agencies, Inc.*, 915 F.2d 1030, 1036–37 (6th Cir.1990) (applying a state law similar to Pennsylvania's late notice law and holding that "[p]rejudice will be found where the delay 'materially' impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party"). In addition, a question remains as to whether the defendants' adequately reserved their rights to assert a late notice defense.

**43.** In the absence of a holding from the Pennsylvania Supreme Court on the issue, I accept Chief Judge Bartle's analysis and prediction of Pennsylvania law on the issue of the duty of good faith and fair dealing in an insurance policy. "Pennsylvania would apply the duty to act in good faith to 'each party' to an insurance contract, including the insured." *Greater N.Y. Mut. Ins. Co. v. North River Ins. Co.*, 872 F.Supp. 1403, 1407–08 (E.D.Pa. 1995). *See also Creeger Brick & Bldg. Supply,*

86. Given my holding above that the Asbestosis Exclusion excludes all asbestos-related claims, Asten had no duty to provide Columbia with notice of the underlying claims because they were excluded from coverage. Therefore, Columbia's affirmative defense that Asten breached its duty of good faith in the *performance* of the contract is moot.[44]

**F. ASTEN'S BREACH OF CONTRACT CLAIM**

87. Asten also alleges that the defendants breached their contracts, *i.e.*, the Subject Policies, with Asten.

88. Under Pennsylvania law, a party asserting a claim for breach of contract against an insurance company must prove: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (1999). *See also Vanderveen v. Erie Indem. Co.*, 417 Pa. 607, 208 A.2d 837, 838 (1965) ("An insurer's failure or refusal to defend a claim within the scope of an insurance policy constitutes a breach of contract for which it is subject to damages recoverable in an action of assumpsit.").

89. The parties do not dispute that the first element of the breach of contract claim has been satisfied. The Subject Policies constitute valid and enforceable contracts.

90. Asten has failed to prove that Columbia or American breached their duties under their respective contracts/policies. Asten claims that the defendants breached the contracts by not honoring their obligations to provide Asten with a defense and indemnification in the underlying asbestos actions. But since I have held that the Asbestosis Exclusion excludes from coverage any asbestos-related claim, the defendants had no duty to defend or indemnify the underlying claims.

91. Therefore, Asten has not met its burden and I find in favor of the defendants on Asten's breach of contract claim.

**G. DEFENDANTS' COUNTERCLAIMS**

*1. Rescission*

92. In an alternative argument, the defendants ask this court to rescind the insurance policies if Asten's interpretation of the exclusion is adopted. Their request to void the policies is based on Asten's misrepresentations in the application process.[45]

---

*Inc. v. Mid–State Bank & Trust Co.*, 385 Pa.Super. 30, 560 A.2d 151, 153–54 (1989) (citing Restatement (Second) of Contracts § 205 with approval); RESTATEMENT (SECOND) OF CONTRACTS § 205 (stating "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement").

44. The *performance* of the contract relates to Asten's failure to abide by the terms of the insurance policies, in particular the notice provisions. Columbia did not argue that Asten breached its duty of good faith in the *enforcement* of the policies, which involves Asten pursuing this coverage action to protect its alleged rights under the policies. Therefore, I do not need to consider such a claim.

45. In a similar alternative argument, Columbia asks the court to rescind its insurance

policies under the "known loss doctrine" due to the existence of asbestos-related products liability suits against Asten at the time the Subject Columbia Policies were entered into. The known loss doctrine "provides that one may not obtain insurance for a loss that either has already taken place or is in progress." *Rohm & Haas Co. v. Cont'l Cas. Co.*, 566 Pa. 464, 781 A.2d 1172, 1176 (2001) (quotations and citation omitted). Although the known loss doctrine has not been formally adopted in Pennsylvania, in *Rohm & Haas* the Supreme Court acknowledged that its prior case law supports such a proposition. The doctrine, as Columbia would apply it in this case, asks, "[W]hether the evidence shows that the insured was charged with knowledge which reasonably shows that it was, or should [have been], aware of a likely exposure to losses which would reach the level of coverage." *Id.* at 1177 (quotations and citation omitted).

476

93. In order to void an insurance policy under Pennsylvania law, the insurer must prove by clear and convincing evidence: "(1) the insured made a false representation; (2) the insured knew the representation was false when it was made or the insured made the representation in bad faith; and (3) the representation was material to the risk being insured." *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir.2004). *See Rohm & Haas Co. v. Cont'l Casualty Co.*, 566 Pa. 464, 781 A.2d 1172, 1179 (2001) (noting that fraudulent misrepresentation "consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth or look or gesture").

94. Since I have determined that the Asbestosis Exclusion bars all underlying claims that allege an asbestos-related injury, I do not need to consider defendants' rescission counterclaim or Asten's statute of limitations affirmative defense.

95. But for the sake of completeness in my findings and conclusions, I do note that the defendants satisfied their burden of demonstrating that the insured Asten made a false representation in its acquisition of the Subject Columbia Policies. In the initial application and during the renewal process, Asten, through Babb, informed Columbia, "We have never had even the slightest hint of a Products Liability claim." CCC4. *See also* CCC7 (Blaustein letter to Sayles in which he reported that Asten had no product liability claims). This statement was false because at that time several of the suits against Asten

alleged (erroneously) products liability claims. *See* CCC142, Asten's Answer to Allstate's Motion to Compel in 1980 Coverage Action (admitting that there were 153 products liability claims).

96. The defendants failed, however, to establish by clear and convincing evidence that Asten made this false statement knowingly or in bad faith. At that time, the statement was true with respect to *meritorious* products claims from paper mill employees. No evidence has been put forth to establish Asten's bad faith in making this statement or that Asten deliberately intended to deceive Columbia with the information provided on the application, especially since Asten disclosed the ATI claims and its manufacturing of asbestos-containing products. *But see supra* Part III.B.2 (discussing how Asten's unjustified twenty-year delay in bringing this coverage action prejudiced Columbia in proving the "intent" element of its rescission claim).

2. *Reformation*

97. Based on the same evidence used to interpret the Asbestosis Exclusion (course of performance and the circumstances surrounding the placement of the Subject Policies), and given that an "exposure to ... asbestosis" is literally impossible, an alternative ground for this court to reach the same conclusion regarding the scope of the exclusion is through the doctrine of reformation. If the Asbestosis Exclusion is interpreted to bar only asbestosis claims then that construction fails to set forth the true agreement of the parties. The parties believed that the Asbestosis Exclusion excluded all asbestos-related

See also id. ("[W]hen an insured knows of an insurable harm incurred prior to the purchase of an insurance policy, the insured has suffered a 'known loss' and the damage is no longer a mere risk and is deemed uninsurable."). I do not need to reach this argument

because the Asbestosis Exclusion excludes any claim alleging an asbestos-related injury. Therefore, regardless of Asten's knowledge in 1981 or 1982 of its potential asbestos-related losses, asbestos-related claims were all excluded from the Subject Policies.

claims and reformation allows me to reform the exclusion to reflect that intent. The Asbestosis Exclusion would be reformed to state: "It is agreed that this policy does not apply to any claim alleging an exposure *to asbestos* or the contracting of asbestosis or any liability resulting therefrom."

■ 98. "If a contract is entered into under a mutual misconception regarding an essential fact, the contract may be reformed if (1) the misconception entered into the contemplation of both parties as a condition of assent, and (2) the parties can be placed in their former position regarding the subject matter of the contract." *Voracek v. Crown Castle USA, Inc.*, 907 A.2d 1105, 1108 (Pa.Super.2006) (internal quotations and citation omitted).[46] *See also Hart v. Arnold*, 884 A.2d 316, 333 (Pa.Super.2005) ("A mutual mistake occurs when the written instrument fails to … set forth the true agreement of the parties." (quotations and citations omitted)). "The doctrine of mutual mistake of fact serves as a defense to the formation of a contract and occurs when the parties to the contract have an erroneous belief as to a basic assumption of the contract at the time of formation which will have a material effect on the agreed exchange as to either party." *Id.*

■ 99. "Where a party alleges that a mutual mistake has been made regarding the terms of the written instrument, the trial court may consider evidence of such a mistake to ascertain the true intent of the parties." *Voracek*, 907 A.2d at 1107. "The language on the instrument should be interpreted in the light of subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed." *Hart*, 884 A.2d at 333.

■ 100. "[T]o justify reformation of a contract on the basis of mutual mistake, evidence of the mistake must be clear and convincing." *Jones v. Prudential Prop. & Cas. Ins. Co.*, 856 A.2d 838, 844 (Pa.Super.2004).

101. In addition to the course of performance of the parties under the Subject Policies over the last twenty years and the circumstances surrounding the entering into the Subject Policies (as discussed above), the communications between Columbia and DVUA, between DVUA and Babb, and between Babb and American and Asten show an intent to exclude all claims arising from a plaintiff's exposure to Asten's asbestos products.

■ 102. The defendants have met their burden. Clear and convincing evidence exists to demonstrate that both parties believed the Asbestosis Exclusion excluded claims that alleged both an exposure to the hazard itself (asbestos) and the injury that results from the exposure of the hazard (asbestosis). All parties intended to follow the common practice in the insurance industry to use such an "either/or" exclusion and exclude all asbestos-related claims.[47]

### H. Aggregate Limits of Liability for the 1982 18–Month Policies

103. The 1982 Subject Policies each had an inception date of April 1, 1982 and a termination date of October 1, 1983. As-

---

**46.** "The mistake must go to the basis of the bargain between the parties, must materially affect the parties' performance, and must not be one as to which the injured party bears the risk before the party will be entitled to relief." *Regscan, Inc. v. Con–Way Transp. Servs.*, 875 A.2d 332, 340 (Pa.Super.2005).

**47.** American expert Mr. Gagan credibly testified that it was common practice in the insurance industry to use an "either/or" exclusion—excluding the hazard itself and the result of the hazard. *See also supra* Part II.G (discussing other insurance policies' asbestos exclusions).

ten asks this court to hold that the annualized aggregates of each of these policies should be counted twice—once for the first twelve months and again for the subsequent six months. Both Columbia and American dispute this construction of the annual aggregate and contend only one annual aggregate applies for each of the policies.

### 1. 1982 Columbia Policies

104. The 1982 primary and excess Columbia policies do not provide more than one aggregate limit for the entirety of each policy's stated policy period. Accordingly, Asten is not entitled to more than the policies' stated aggregate limits of $1,000,000 and $10,000,000 respectively.

#### a. 1982 Columbia Primary Policy

105. As noted in the findings of fact, the plain and unambiguous language of the 1982 Columbia Primary Policy, in an endorsement entitled "Combined Single Limit of Liability," states that its limits of liability are "$1,000,000 each occurrence as respects bodily injury liability or property damages liability or both combined" and "$1,000,000 aggregate." The endorsement further states that "[s]ubject to the above provision respecting 'each occurrence,' the total liability of the company for all damages shall not exceed the limit of liability stated in this endorsement as 'aggregate.'" Asten has not pointed to another part of the policy or presented any evidence to support its position that multiple aggregates apply to the 1982 Columbia Primary Policy.

106. Accordingly, I find that the 1982 Columbia Primary Policy contains a single aggregate in the amount of $1,000,000 that covers the entire period of the policy.

#### b. 1982 Columbia Excess Policy

107. The terms of the 1982 Columbia Excess Policy also clearly state a single aggregate amount applies for the entire policy period.

108. The 1982 Columbia Excess Policy provides that the policy "shall apply only to those coverages for which a limit of liability is inserted in Column 1 provided further that the limit of the company's liability under this policy shall not exceed the applicable amount inserted in Column 1." Column 1 of the 1982 Columbia Excess Policy contains policy limits of $10,000,000. Therefore, the limit of Columbia's liability during the entire policy period is $10,000,000.

109. The plain follow form language in the policy does not change the policy's $10,000,000 aggregate limit. The 1982 Columbia Excess Policy follows form to the terms of the underlying American policy but with several exceptions, including the pertinent exception of provisions relating to the "amounts of the limits of liability" and "any other provisions therein which are inconsistent with the provisions of this policy." Therefore, regardless of what the underlying American policy states, the 1982 Columbia Excess Policy's liability is $10,000,000.

### 2. 1982 American Policies[48]

---

**48.** American submitted a supplemental findings of fact and conclusions of law to contest the occurrence limits of its 1982 policies as it pertains to Asten's asbestos liabilities. American contends that Asten's asbestos liabilities arise out of one "occurrence" for purposes of policy limits, such that only one, single, $10 million "per occurrence" limit is potentially available under each of the 1982 policies for

the entire 18 month period. American cites to dozens of cases to support its argument that all of Asten's underlying asbestos-related claims arise out of the single occurrence of Asten's decision to manufacture its product with asbestos. *See, e.g., Liberty Mut. Ins. Co. v. Treesdale, Inc.,* 418 F.3d 330 (3d Cir.2005) (applying Pennsylvania law and the "cause of

110. Asten's two eighteen-month policies each clearly extended a single aggregate limit to Asten. The policies provide a single aggregate limit per "annual" period, and there was but one single "annual period" to each policy.

111. To read a second aggregate limit into the insurance policy for the six-month period from April 1, 1983 to October 1, 1983 would be to re-write the insurance policies. *See generally Commercial Union Ins. Co. v. American Employers' Ins. Co.*, No. 00–12267–DPW, 2003 WL 1786863, **15–16, 2003 U.S. Dist. LEXIS 4974, at *45–47, *vacated and remanded by* 413 F.3d 121 (1st Cir.2005) (citing cases that hold a multi-year insurance policy's limits will not be annualized without an express annualization provision in the policy). Since there is no express language providing for a second aggregate, only a single aggregate was intended and provided for in the American policies.

112. Moreover, the request for these policies was for 18–month policies, each for a single premium, and each with a single limit.

## I. Duty to Defend and Pay Defense Costs Under Defendants' Excess Policies

### 1. Columbia Excess Policies

113. The clear and unambiguous language of the Columbia excess policies provide that the insurer does not have a duty to defend or to indemnify defense costs under the policies.

114. The insuring agreements in both Columbia excess policies, coupled with their definition of the word "loss," expressly omit coverage for "investigation, adjustment, defense or appeal costs, expenses

and costs and expenses incident to any of the same, notwithstanding that the underlying insurance may provide insurance for such costs and expense."

■ 115. Asten's reliance on the deposition testimony of Columbia's Rule 30(b)(6) designee is unavailing. A duty to defend is determined by the policy's language. *See Commercial Union Ins. v. Pittsburgh Corning Corp.*, 789 F.2d 214 (3d Cir.1986) (determining an insurer's contractual duty to defend based on Pennsylvania law and the language of the policy). And the interpretation of an unambiguous insurance policy provisions is the court's duty. *See Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999).

### 2. 1982 American Excess Policy

116. According to the unambiguous terms of 1982 American Express Policy, American is not obligated to provide or fund a defense for Asten. American is only required to reimburse Asten for any defense expenses it incurs with American's *consent.*

117. Asten's coverage under this policy is limited to damage expenses "incurred in settlement or satisfaction of claims or suits."

118. The duty to defend is contractual and if there is no contract to defend than there is no duty to defend. *See* 7C Appleman, Insurance Law and Practice, § 4682 (1979 & Supp.1995); *see also City of Burlington v. Arthur J. Gallagher & Co.*, 944 F.Supp. 333, 335–36 (D.Vt.1996). Here, the 1982 American Excess Policy clearly states that American "shall *not* ... be called upon to assume charge of the settle-

---

loss" test to uphold the district court's conclusion that all "the asbestos claimants' injuries stem form a common source, that is, the manufacture and sale of the asbestos-contain-

ing products"). Since any claim alleging an asbestos-related injury is excluded, there is no need to take up this argument.

ment or defense of any claims made, or suits brought, or proceedings instituted against the Insured." AMER53 (emphasis added).

119. To the extent Asten attempts to distinguish between American's duty to defend and its duty to pay defense costs, the plain language of the 1982 American Excess Policy does not impose a *duty* to pay defense costs on American. Rather, the policy only requires the insurer to pay the defense costs it consents to. As another court stated in interpreting the very same provision [49]:

> [T]he obligation of American to pay defense costs is neither fixed nor absolute. The obligation is plainly stated that American will pay costs which may be incurred by the insured with the consent of American. Thus, the entire obligation is conditioned on the consent of American and not simply the procedure by which the obligation is carried out.

*Crown Center Redevelopment Corp. v. Occidental Fire & Casualty Co.*, 716 S.W.2d 348, 356–57 (Mo.Ct.App.1986). *See also City of Burlington*, 944 F.Supp. at 337 ("Courts across the country have construed policy language requiring the consent of the insurer as creating an option, but not a duty, to defend."); *WDC Venture v. Hartford Accident and Indem. Co.*, 938 F.Supp. 671, 675 (D.Haw.1996) (applying similar consent-to-defense clause).

■ 120. Asten attempts to analogize the consent-to-defense clause with a consent-to-settle clause in an insurance policy and argues that American bears the burden of proving that Asten's legal expenses are unreasonable to avoid paying them. This argument fails. Under a consent-to-settle clause in an insurance policy, an

insurer cannot unreasonably withhold from an insured its consent to settle with a third party. The purpose of this "reasonableness" rule is to prevent an insurer from depriving the insured of benefits for which it had paid. *See Nationwide Mut. Ins. Co. v. Lehman*, 743 A.2d 933, 941 (Pa.Super.1999). In contrast, the consent-to-defense clause in the 1982 American Excess Policy does not involve a benefit for which Asten paid premiums. American's Excess Policy provides no duty to defend. As the word "may" implies, the provision simply requires American to pay the defense costs that it, in its own judgment, acquiesces to. (If American chooses to interfere with Asten's defense of the underlying claims because American believes it will better protect its interests and limits under the policy, then it is only appropriate that the policy require American to cover the costs of that defense.) *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1219 (2d Cir. 1995) ("[T]he insurer has no duty to defend or pay costs, but only has the right to do so at its own election. The insurer can permit the insured's defense to proceed and take the chance that the insured might exceed the limits of other liability coverage, or participate in the defense and agree to pay all or part of the defense costs incurred."). However, this court will not read a duty into an insurance policy.

## IV. CONCLUSION

Based on the findings of fact and conclusions of law, I conclude as to defendant Columbia:

(1) Asten's coverage suit against Columbia is barred under the equitable doctrine of laches.

---

**49.** The consent-to-defense clause states: "Loss expenses and legal expenses, including court costs and interest, if any, which may be incurred by the Insured with the consent of the Company in the adjustment or defense of claims, suits or proceedings shall be borne by the Company and the Insured in the proportion that each party's share of loss bears to the total amount of said loss." AMER53.

(2) Based on the Asbestosis Exclusion, Columbia does not have a duty to indemnify or defend Asten under the Subject Columbia Policies for any claim that alleges an exposure to an Asten asbestos-containing product or the contracting of an asbestos-related disease.

(3) The "stub issue" is resolved in favor of Columbia and the 1982 Columbia Primary and Excess Policies provide one, single aggregate limit for the entirety of each policy's stated policy period.

(4) The 1981 and 1982 Columbia Excess Policies contain no obligation to defend or to pay defense expenses.

(5) As a result of my finding in favor of Columbia with respect to Asten's declaratory action on the Asbestosis Exclusion, I dismiss with prejudice Asten's bad faith claim against Columbia.[50]

Based on the findings of fact and conclusions of law, I conclude as to defendant American:

(1) Based on the Following Form Products Liability Endorsement in each of the Subject American Policies, which incorporated the Asbestosis Exclusion found in the Subject Columbia Policies, American does not have a duty to indemnify or defend Asten under the Subject American Policies for any claim that alleges an exposure to an Asten asbestos-containing product or the contracting of an asbestos-related disease.

(2) The "stub issue" is resolved in favor of American and the 1982 American Umbrella and Excess Policies provide one, single aggregate limit for the entirety of each policy's stated policy period.

(3) The 1982 American Excess Policy contains *no duty* to defend or pay Asten's defense costs. American is only required to reimburse Asten for any defense expenses Asten incurs with American's *consent.*

An appropriate Order follows.

### *Addendum 1*

Plaintiffs filing new claims against Asten each year. *See* P172.

| YEAR | No. of Claims filed against AJN |
|------|-------------------------------|
| 1978 | 146 |
| 1979 | 140 |
| 1980 | 99 |
| 1981 | 366 |
| 1982 | 176 |
| 1983 | 94 |
| 1984 | 32 |
| 1985 | 22 |
| 1986 | 87 |
| 1987 | 6 |
| 1988 | 6 |
| 1989 | 78 |
| 1990 | 54 |
| 1991 | 24 |
| 1992 | 53 |
| 1993 | 762 |
| 1994 | 3,576 |
| 1995 | 8,484 |

**50.** In my Order dated June 22, 2006, I bifurcated the trial for declaratory relief from the trial on the bad faith claim against Columbia. *See* Docket No. 252. *See Williams v. Hartford Cas. Ins. Co.,* 83 F.Supp.2d 567, 574 (E.D.Pa. 2000) ("[I]f there is a reasonable basis for delaying resolution of a claim, ... there cannot, as a matter of law be bad faith.").

| 1996 | 4,062 |
|------|-------|
| 1997 | 3,952 |
| 1998 | 13,024 |
| 1999 | 3,818 |
| 2000 | 18,887 |
| 2001 | 27,040 |
| 2002 | 15,383 |

### ORDER

**AND NOW,** this 30th day of March, 2007, upon consideration of the trial testimony, the admitted exhibits, the deposition designations, the parties' proposed findings of fact and conclusions of law, and the parties' oral argument, it is hereby **ORDERED,** that based upon the Findings of Fact and Conclusions of Law detailed above:

(1) AstenJohnson, Inc.'s coverage suit against Columbia Casualty Company is barred under the equitable doctrine of laches.

(2) Columbia Casualty Company does not have a duty to indemnify or defend AstenJohnson, Inc. under the Subject Columbia Policies for any claim that alleges an exposure to an AstenJohnson, Inc. asbestos-containing product or the contracting of an asbestos-related disease.

(3) The 1982 Columbia Primary and Excess Policies provide one, single aggregate limit for the entirety of each policy's stated policy period.

(4) The 1981 and 1982 Columbia Excess Policies contain no obligation to defend or to pay defense expenses.

(5) I dismiss with prejudice AstenJohnson, Inc.'s bad faith claim against Columbia Casualty Company.

(6) American Insurance Company does not have a duty to indemnify or defend AstenJohnson, Inc. under the Subject American Policies for any claim that alleges an exposure to an AstenJohnson, Inc.

asbestos-containing product or the contracting of an asbestos-related disease.

(7) The 1982 American Umbrella and Excess Policies provide one, single aggregate limit for the entirety of each policy's stated policy period.

(8) The 1982 American Excess Policy contains *no duty* to defend or pay AstenJohnson, Inc.'s defense costs.